**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ALESHIA CYRESE HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 12-CV-068-JED-FHM |
| | ) | |
| STANLEY GLANZ, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

/s/ Robert M. Blakemore
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Donald E. Smolen, II, OBA #19944
donaldsmolen@ssrok.com
Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669

Louis W. Bullock, OBA #1305
lbullock@bullock-blakemore.com
Patricia W. Bullock, OBA #9569
pbullock@bullock-blakemore.com
Bullock Bullock & Blakemore PLLC
110 West Seventh Street, Suite 707
Tulsa, OK 74119
Phone:  (918) 584-2001
Fax:  (918) 779-4383
***Attorneys for Plaintiff***

December 6, 2013

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ........................................................................................................ 1

LCVR 56.1(c) STATEMENT OF FACTS .................................................................... 1

    RESPONSE TO SHERIFF GLANZ'S "STATEMENT OF MATERIAL FACTS
    NOT IN DISPUTE" ............................................................................................ 1

    ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT ................ 16

ARGUMENT ............................................................................................................... 19

    I.      DEFENDANTS ARE *NOT* ENTITLED TO SUMMARY
            JUDGMENT ON PLAINTIFF'S CONSTITUTIONAL CLAIMS ............................. 19

        A.    The General The General Legal Framework of Plaintiff's
            Claims: Cruel     and Unusual Punishment (the Objective and
            Subjective Components) ..................................................................... 19

        B.    Plaintiff Has Shown Underlying Constitutional Violations by
            D.O. Johnson and D.O. Thomas (as Well as Institutional
            Violations) ......................................................................................... 21

        C.    Sheriff Glanz is *Not* Entitled to Summary Judgment in His
            Individual Capacity *or* Official Capacity ......................................... 26

            1.    Plaintiff Need Not Prove That Sheriff Glanz Had Direct
                "On-The-Ground" Control Over Plaintiff ...................................... 27

            2.    There is Ample Evidence of an Affirmative Link Between
                 Plaintiff's Injuries and Policies or Customs Which Sheriff
                 Glanz Possessed Responsibility For ............................................. 28

                a.    A Pattern of Sexual Misconduct and Security Lapses in
                    the Medical Unit; A "Culture of Indifference" ...................... 29

                b.    Inadequate Supervision/"Blind Spots" ................................... 29

                c.    Failure to Enforce Policies Necessary to the Safety of
                    Inmates/Staffing ................................................................... 31

             3.    The Evidence Establishes Sheriff Glanz's "Deliberate

Indifference"..................................................................... 32

II:    Defendants Are *Not* Entitled To Qualified
       Immunity. ............................................................. 34

III.   Plaintiff's Claims Are *Not* Barred By The PLRA ........................... 35

## **TABLE OF AUTHORITIES**

<u>Cases Cited</u>                                                                                       <u>Page</u>

*Archuleta v. Wagner,* 523 F.3d 1278 (10th Cir. 2008) ....................................................22

*Berry v. City of Muskogee, Okl.,* 900 F.2d 1489 (10th Cir. 1990) ...................................21

*Bowling v. Rector,* 584 F.3d 956 (10th Cir. 2009) ...........................................................34

*Bryson v. City of Oklahoma City,* 627 F.3d 784 (10th Cir. 2010) ....................................28

*Casey v. City of Fed. Heights,* 509 F.3d 1278 (10th Cir.2007) .........................................34

*Clark v. Wilson,* 625 F.3d 686 (10th Cir. 2010) ................................................................34

*Davis v. City of Aurora,* 705 F.Supp.2d 1243 (D. Colo. 2010) ..................................27, 28

*DeSpain v. Uphoff,* 264 F.3d 965 (10th Cir. 2001) .......................................................7, 21

*Dodds v. Richardson,* 614 F .3d 1185 (10th Cir. 2010) ...............................................26, 27

*Farmer v. Brennan,* 511 U.S. 825 (1994) ....................................................................20, 21

*Goka v. Bobbitt,* 862 F.2d 646 (7th Cir.1988) ..................................................................31

*Henderson v. Glanz,* 2012 WL 5931546 (N.D. Okla. Nov. 27, 2012) ........................22, 24

*Hope v. Pelzer,* 536 U.S. 730 (2002) .................................................................................34

*Hovater v. Robinson,* 1 F.3d 1063 (10th Cir. 1993) ..........................................................20

*LaMarca v. Turner,* 995 F.2d 1526 (11th Cir.1993) .........................................................31

*Little v. Jones,* 607 F.3d 1245 (10th Cir. 2010) .................................................................35

*Mata v. Saiz,* 427 F.3d 745 (10th Cir. 2005) ....................................................................16

*McBeth v. Himes,* 598 F.3d 708, 716 (10th Cir. 2010) ......................................................34

*Poore v. Glanz,* 2012 WL 728199 (N.D. Okla. Mar. 6, 2012) ..........................................26

*Poore v. Glanz,* 2012 WL 1536933 (N.D. Okla. Apr. 30, 2012) ......................................20

*Porro v. Barnes,* 624 F.3d 1322 (10th Cir. 2010) .............................................................26

*Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008) ........................................................*passim*

*Ware v. Jackson Cnty., Mo.,* 150 F.3d 873 (8th Cir. 1998) ........................................13, 28

Constitutional Provisions

U.S. Const., amend. VIII ........................................................................................*passim*

Statutes

42 U.S.C. § 1983 ........................................................................................................26, 27

42 U.S.C. § 1997(e)(a)...................................................................................................35

## Introduction

On September 27, 2011, Plaintiff Aleshia Henderson ("Plaintiff"), a female inmate, was brutally raped by a male inmate. At the time, Plaintiff had been left alone and shackled in the medical unit's "tub room" at the Tulsa County Jail. As part of an internal investigation into the matter, the Tulsa County Sheriff's Office ("TCSO") concluded as follows:

> Regarding the alleged sexual assault [of Plaintiff], *two major <u>causal factors</u>* were identified. First, *the tub room was unsecured* at the time of the incident. It appears this was due to *D.O. Johnson failing to relock the door* when the medical emergency was called. The second was *D.O. Thomas failing to remain at his assigned post*. Thomas left the unit to respond to a medical emergency, thereby diminishing the ability of officers to properly supervise the unit. When D.O. Johnson entered the examination room, as required by policy, *the main hall of the medical unit was left unsupervised and inmates were unsecured.*

IA Report (Ex. 1) at GLANZ-AH0310 (emphasis added). As TCSO clearly acknowledges, the rape of Plaintiff simply would not have occurred were it not for Defendants' failure to observe minimal security and supervisory measures. The rape of Plaintiff would not have occurred absent Defendants' disregard of known, obvious and substantial risks to Plaintiff's safety.

In addition, the rape of Plaintiff was one of many incidents of sexual misconduct that occurred in the medical unit. Despite Sheriff Glanz's knowledge of these incidents of sexual misconduct and security breaches within the medical unit, he failed to take reasonable measures to alleviate identified safety risks. Plaintiff fell victim to a "culture of indifference" and a custom of inadequate supervision. The Motion for Summary Judgment should be denied.

## LCvR 56.1(c) Statement of Facts

**A.    Response to Sheriff Glanz's "Statement of Material Facts Not in Dispute"**

1

**1-4.**    Paragraphs 1-4 of Defendants' "Statement of Facts" are based on irrelevant and immaterial character evidence, which is inadmissible under Rules 402, 403 and 404 of the Federal Rules Evidence.  Plaintiff was booked into the Tulsa County Jail on June 3, 2011. *See* Dkt. #82-1 at 1.  At the time, Plaintiff was twenty (20) years-old. *Id.* Due to her struggles with mental illness, Plaintiff was identified by TCSO as a "special needs" inmate. *See, e.g.,* Schwartz Depo (Ex. 2) at 22:21 – 23:12.

**5.**    On the evening of September 27, 2011, Defendant Dalean Lynn Johnson ("D.O. Johnson") and Defendant Michael Thomas ("D.O. Thomas") were the only detention officers ("D.O.") assigned to the medical unit. *See* D.O. Johnson Depo. (Ex. 3) at 54:25 – 55:6.

**6.**    At the time that Plaintiff was sexually assaulted, there was ***no*** detention or medical staff monitoring the main hall of the medical unit.  *See, e.g.,* Williams Depo. (Ex. 4) at 9:21 – 11:8; 12:21-25; 21:3-7; Incident Report (Ex. 5) at GLANZ-AH0760 ("Williams stated a medical emergency was called, the medical staff left, and he did not see any detention staff for an unknown period of time.").

**7-8.**    After D.O. Thomas left his post on the evening of September 27, 2011, D.O. Johnson was the only D.O. in the entire medical unit (*i.e.,* the medial unit was single-staffed). *See, e.g.,* D.O. Thomas Depo. (Ex. 6) at 30:25 – 31:10; D.O. Johnson Depo. (Ex.3) at 55:14-20.  It is a violation of TCSO policy for the medical unit to be single-staffed. *See* D.O. Johnson Depo. (Ex.3) at 13:12-15.  According to the IA Report generated by TCSO in this case, "[t]he Medical Unit is essentially a segregation unit, ***requiring*** ***two*** ***officers*** ***at*** ***all*** ***times.***" IA Report (Ex.1) at GLANZ-AH0310 (emphasis added).   According to Chief Robinette, single-staffing the medical unit is *not safe*. *See*

2

Robinette Depo. (Ex. 7) at 111:13-21.   Nonetheless, it was a *common* occurrence for medical unit officers to be called out of the unit to perform other duties. D.O. Johnson Depo. (Ex. 3) at 13:2-7; D.O. Thomas Depo. (Ex. 6) at 14:7-10.   In such common instances when one of the D.O.'s left the medical unit, the medical unit was single-staffed. *See* D.O. Johnson Depo. (Ex. 3) at 13:8-11.   As discussed more fully *infra*, this is precisely what happened in the case-at-bar.   Further, TCSO did not provide the medical unit officers with any training regarding whether, or when, it was appropriate to leave the medical unit single-staffed. *See* D.O. Thomas Depo. (Ex. 6) at 30:9-23. Additionally, after D.O. Thomas left the medical unit on September 27, 2011, D.O. Johnson vacated the main hall of the medical unit for one of the treatment rooms. *See, e.g.,* IA Report (Ex. 1) at GLANZ-AH0307-08.

According to Jeff Eiser, Plaintiff's expert, "there has to be backup[] [staffing]. There has to be support systems so if somebody does have to leave the floor, there should be somebody in place to supplement what the officer would do [in order to] maintain control of the inmates." Eiser Depo. (Ex. 8) at 93:3-8; *see also id* at 121:4-7 ("I have an issue with an officer [*i.e.,* D.O. Thomas] leaving a unit that really he didn't have to leave, and he has no supplemental backup on that particular unit.").

**9-10.**   Inmate Jessie Earl Johnson ("Inmate Johnson") was booked into the Tulsa County Jail on August 29, 2011 on a felony charge of assault and battery on a police officer. *See* Johnson Booking Detail (Ex. 9) at GLANZ-AH1093-94.   The "Booking Notes" regarding Inmate Johnson provide as follows:

> "Per Sgt Collett Inmate [Johnson] is a[n] ***extreme escape risk***[.] [U]se ***extreme caution*** when moving Inmate! ***Inmate [Johnson] will be black boxed for any movement outside of the pod Per Chief Robinette.***"

*Id.* at GLANZ-AH1094 (emphasis added).  The Tulsa County Sheriff's Office ("TCSO") also identified Inmate Johnson as "[a]ssaultive" at the time of booking. *Id.*  On September 13, 2011, TCSO once again identified Inmate Johnson as an "[e]scape [r]isk". *Id.* Nevertheless, just hours later, on September 14, 2011, Inmate Johnson was inexplicably granted "[t]rustee [s]tatus" by TCSO. *Id.*  As a trustee, Inmate Johnson was permitted to leave his pod, *without escort or restraints*, and go to the medical unit. *See, e.g.,* Officer Johnson Depo. (Ex. 3) at 27:6 – 28:1; Osman Depo. (Ex. 10) at 26:20 – 27:1.

In the early evening of September 27, 2011, Plaintiff was taken to the Jail's medical unit because she was having chest pains. *See* Incident Report (Ex. 5) at GLANZ-AH0751; IA Report (Ex. 1) at GLANZ-AH0307. D.O. Thomas saw Plaintiff arrive in the medical unit at approximately 5:30 pm.  *See* IA Report (Ex. 1) at GLANZ-AH0309; D.O. Thomas Depo. (Ex. 6) at 26:22 – 27:1.  D.O. Thomas also observed that Plaintiff was wearing handcuffs. D.O. Thomas Depo. (Ex. 6) at 28:6-8.  Plaintiff was placed in the medical unit's "tub room".  Incident Report (Ex. 5) at GLANZ-AH0751.

The tub room is located in the main hall of the medical unit. *See* D.O. Johnson Depo. (Ex. 3) at 14:22-25.  The tub room is frequently used to segregate inmates. *Id.* at 15:1-3.  While there is a small window on the tub room door, the window is typically covered up. *Id.* at 15:13-19.  There is no video surveillance of the area outside of the tub room door. *See* D.O. Johnson Depo. (Ex. 3) at 48:10-16; Schwartz Depo. (Ex. 2) at 47:1-5.

At the time Plaintiff entered the medical unit, a male inmate, Steven Williams ("Inmate Williams"), was in the medical unit to receive a breathing treatment. *See* Williams Depo. (Ex. 4) at 9:1-14; 12:11-15.  Inmate Williams witnessed D.O. Johnson

place Plaintiff in the tub room. *Id.* at 12:11-15.  Inmate Williams observed that at the time

Plaintiff was placed in the tub room she was in handcuffs and leg restraints. *Id.*

    **11.**    As D.O. Johnson admits, the medical unit can be "chaotic" at times. D.O.

Johnson Depo. (Ex. 3) at 18:8-11.  The medical unit is one area of the Jail that is

frequented by both male and female inmates. *Id.* at lines 12-16.  The presence of both

male and female inmates can pose challenges in supervising the inmates. *Id.* at 18:22 –

19:2.  The medical unit was "very busy" on September 27, 2011. *Id.* at 35:6-10.

    On September 27, 2011, Inmate Johnson was working in the Jail's kitchen as a

trustee. *See* Incident Report (Ex. 5) at GLANZ-AH0754. Inmate Johnson left the kitchen

at some point and went to the medical unit in an attempt to get some Advil. *Id.*

According to TCSO's Incident Report, "[t]here was no documentation in the [k]itchen's

logbook of the times or that [Inmate] Johnson even came to the [k]itchen." *Id.*  As a

trustee, Inmate Johnson was permitted to enter the medical unit unescorted and without

restraints. *See* D.O. Johnson Depo. (Ex. 3) at 27:23 – 28:1.    Inmate Johnson noticed

Plaintiff when she briefly left the tub room to go the bathroom and attempted to get her

attention. *See* Incident Report (Ex. 5) at GLANZ-AH0754.

    It is **_undisputed_** that after Plaintiff was returned to the tub room, **_D.O. Johnson_**

**_unlocked the tub room door._** *See, e.g.,* D.O. Johnson Depo. (Ex. 3) at 45:1-3; 46:14 –

47:14; IA Report (Ex. 1) at GLANZ-AH0308; Schwartz Depo. (Ex. 2) at 13:2-7 ("Q.

…Officer Johnson left the tub room unlocked? A. Yes. Q. And at that time Aleshia

Henderson was in restraints; correct? A. Yes, that's right.").  Inmate Williams witnessed

D.O. Johnson's failure to lock the tub room door. *See* Williams Depo. (Ex. 4) at 10:6-13;

41:3-5.  D.O. Johnson admits that Inmate Johnson was sitting across from the nurses'

station in an area where he could have seen her unlock the tub room door. *See* D.O. Johnson Depo. (Ex. 3) at 47:18-21; 49:12-13.  However, because there was no video surveillance in the main hall of the medical unit, TCSO did not monitor, and could not have monitored,  D.O. Johnson's failure to lock the tub room door. *Id.* at 48:10-16.

**12-16.** *See* Plaintiff's Stat. of Facts (A), ¶¶ 7-8, *supra.*  After D.O. Johnson unlocked the tub room door, a medical emergency was called in pod J7. *See* IA Report (Ex. 1) at GLANZ-AH0308-09; D.O. Thomas Depo. (Ex. 6) at 28:12-14; D.O. Johnson Depo. (Ex. 3) at 46:14 – 47:6.  D.O. Thomas had seen Plaintiff in the tub room prior to the medical emergency being called.  D.O. Thomas Depo. (Ex. 6) at 27:10-13.  D.O. Thomas responded to the medical emergency by leaving his post in the medical unit to take a gurney to pod J7. *See, e.g.,* IA Report (Ex. 1) at GLANZ-AH0309; D.O. Thomas Depo. (Ex. 6) at 29:5-7.  D.O. Thomas admits that he could have sent an inmate trustee to J7 with the gurney rather than leaving his post in the medical unit; he simply chose not to. *See* D.O. Thomas Depo. (Ex. 6) at 29:11-14.  Before leaving his post, D.O. Thomas did nothing to secure or restrain the inmates in the medical unit and did not check on Plaintiff. *Id.* at 31:14-22.  After leaving his post in the medical unit, D.O. Thomas stayed in J7 for approximately 15 to 20 minutes.  *See* IA Report (Ex. 1) at GLANZ-AH0309; D.O. Thomas Depo. (Ex. 6) at 28:12-14.

When D.O. Johnson left the main hall of the medical unit to go to the treatment room, she knew that Plaintiff was in the tub room; however, once D.O. Johnson reached the treatment room, she could not monitor the tub room. *See* D.O. Johnson Depo. (Ex. 3) at 43:21 – 44:10.  Before leaving the main hall of the medical unit, D.O. Johnson did not lock down Inmate Johnson, an unsecured inmate. *See, e.g.,* IA Report (Ex. 1) at GLANZ-

AH0308; D.O. Johnson Depo. (Ex. 3) at 51:11-19.   Indeed, D.O. Johnson admits that

when she left the main hall of the medical unit, she left two unsecured and unrestrained

male inmates (*i.e.,* Inmate Johnson and Inmate Williams) completely unsupervised by

any detention staff. *Id.* at 52:23 – 53:5.

17.   *See* Plaintiff's Stat. of Facts (A), ¶ 11, *supra.   D.O. Johnson acknowledges*

*that when she left the main hall of the medical unit, Plaintiff was left alone in the*

*unlocked tub room while in restraints. See* D.O. Johnson (Ex. 3) at 53:6-9.   All of D.O.

Johnson's actions in this regard were contrary to TCSO policy. *Id.* at 53:10-13.   D.O.

Johnson recalls in detail unlocking the tub room door for one of the nurses. D.O. Johnson

Depo. (Ex. 3) at 45:1-3; 46:14 – 47:14. Thus, it strains logic and credibility for D.O.

Johnson to maintain that she was unaware the tub room door was unlocked; and for this

reason, there is a genuine factual dispute.[1]

18-19.   As Plaintiff's expert Jeff Eiser explained, both D.O. Johnson and D.O.

Thomas should have verified that the tub room door was locked before abandoning their

post. *See* Eiser Depo. (Ex. 8) at 232:8 – 233:12.   As Mr. Eiser testified: "If you are going

to have to leave [your post], you have to make sure you and your partner communicate,

make sure all the basic security things are done, doors are locked, inmates are secured,

and *then* leave. … ***That's corrections 101."*** *Id.* (emphasis added).   Mr. Eiser further

testified that D.O. Johnson disregarded known and substantial risks to Plaintiff's safety.

*Id.* at 219:21 – 220:8; *see also id.* at 240:11-20; 245:1-12 ("In this case, the threat was a

---

[1]   "Because it is difficult, if not impossible, to prove another person's actual state of
mind, whether an official had knowledge may be inferred from circumstantial evidence."
*DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001).

loose male inmate [and] a double restrained [female] inmate in an out-of-view area from the officer. So those are all risks that she is aware of or should have been aware of.").

**20.**   After D.O. Johnson left the main hall of the of the medical unit, the *only* persons present in the main hall were Inmate Johnson, Inmate Williams and Plaintiff (in the tub room). *See* Williams Depo. (Ex. 4) at 10:19-22; 12:21-25; Incident Report (Ex. 5) at GLANZ-AH0760.  Inmate Johnson had "easy access" to the tub room. *See* Williams Depo. (Ex. 4) at 21:3-7. Inmate Williams witnessed Inmate Johnson enter the tub room, where he remained for approximately ten (10) minutes. *Id.* at 9:21 – 11:8.  When Inmate Johnson entered the tub room, the only persons present in the main hall of the medical unit were Inmate Johnson, Inmate Williams and Plaintiff. *Id.*

After Inmate Johnson entered the tub room, he walked up to Plaintiff and kissed her, Plaintiff attempted to push Inmate Johnson away, but Inmate Johnson choked her. *See* Preliminary Hearing Tr., 11/15/11 (Ex. 11) at 6:21 – 7:23.  After Inmate Johnson began choking Plaintiff, she felt dizzy like she was going to "pass out". *Id.* at 8:2-15. Inmate Johnson next pulled down Plaintiff's pants and began rubbing his genitals against her. *Id.* at 8:16 – 9:7.  During this time, Plaintiff felt panicked and went "numb". *Id.* at 8:23 – 9:4.  Plaintiff tried to scream, but no sound came out; Inmate Johnson had put his hand over Plaintiff's mouth. *Id.* at 9:8-13.  Inmate Johnson proceeded to penetrate Plaintiff's vagina with his penis. *Id.* at 9:19 – 10:10.  Plaintiff did not consent to this sexual intercourse with Inmate Johnson. *Id.* at 11:1-3.  Plaintiff struggled and attempted to get away from Inmate Johnson with all her might, but he overpowered her with force. *Id* at 11:8 – 12:7.  After Inmate Johnson had forced sexual intercourse with Plaintiff, he licked her vagina against her will. *Id.* at 12:9-17; 13:8-10.  Inmate Johnson suddenly

stopped, grabbed Plaintiff's neck and Plaintiff started crying. *Id.* at 12:18-24.  Plaintiff then pulled up her pants; Inmate Johnson "peeked" out of the tub room door and left the tub room. *Id.* at 12:24 – 13:3.

At approximately 6:56pm on the evening of September 27, 2011, D.O. Johnson finally returned to the main hall of the medical unit and observed that the tub room door was closing. *See, e.g.,* Incident Report (Ex. 5) at GLANZ-AH0752; IA Report (Ex. 1) at GLANZ-AH0307; D.O. Johnson Depo. (Ex. 9) at 57:16-22.  Contemporaneously, D.O. Thomas was returning to the medical unit from pod J7 and also witnessed the tub room door closing. D.O. Thomas Depo. (Ex. 6) at 32:15 – 33:1.  D.O. Johnson saw Inmate Johnson just outside of the tub room and asked him what he was doing, he replied "Nothing Ms. Johnson". *See* Incident Report (Ex. 5) at GLANZ-AH0753.  D.O. Johnson entered the tub room and asked Plaintiff if Inmate Johnson had touched her; Plaintiff nodded yes. *Id.*

**21.**   At approximately 7:30pm, Plaintiff was interviewed by TCSO Sergeant Melissa Tapper.  *See, e.g.,* Incident Report (Ex. 5) at GLANZ-AH0753.  Plaintiff reported to Sergeant Tapper that she had been raped in the tub room. *Id.*

Plaintiff was transported to Hillcrest Hospital for a "SANE" rape test. *See, e.g.,* Incident Report (Ex. 5) at GLANZ-AH0754; Osman Depo. (Ex. 10) at 18:13-16.  SANE Nurse Dorothy Patrock determined that there was "bruising, [s]welling and some mid-line tearing in [Plaintiff's] vagina consistent with forced intercourse."  *See* Incident Report (Ex. 5) at GLANZ-AH0754; *see also* TPD Sexual Assault Report (Ex. 12) at GLANZ-AH0776-777.

**22-23.** TCSO launched both an IA investigation and a criminal investigation into

the September 27, 2011 incident involving Plaintiff. *See* IA Report (Ex. 1); and Randall

Depo. (Ex. 13) at 7:1-25.   TCSO's IA investigation concluded in the following findings:

> After conducting interviews and reviewing reports, I found *policy was violated.*
> The Medical Unit is essentially a segregation unit, requiring *two officers at all
> times.* D.O. Thomas left his post to respond to a medical emergency when the
> inmate worker could have accomplished the same task. Additionally, D.O.
> Johnson and D.O. Thomas failed to maintain the log book as required by policy.
> While this is a shared responsibility, Johnson knew Henderson was on the unit at
> some time around 17:30 hours and the log never reflected her arrival.

> Regarding the alleged sexual assault, *two major <u>causal</u> factors* were identified.
> First, *the tub room was unsecured* at the time of the incident. It appears this was
> due to *D.O. Johnson failing to relock the door* when the medical emergency
> was called. The second was *D.O. Thomas failing to remain at his assigned post.*
> Thomas left the unit to respond to a medical emergency, thereby diminishing the
> ability of officers to properly supervise the unit. When D.O. Johnson entered the
> examination room, as required by policy, *the main hall of the medical unit was
> left unsupervised and inmates were unsecured.*

IA Report (Ex. 1) at GLANZ-AH0310 (emphasis added).   *D.O. Johnson does not dispute*

*IA's findings. See* D.O. Johnson Depo. (Ex. 3) at 62:6 – 63:3.   D.O. Thomas does not

dispute the IA findings either, with the proviso that Thomas does not believe that an

inmate worker could have performed the same duties as he could have. *See* D.O. Thomas

Depo. (Ex. 6) at 34:23 – 36:17.

       In addition, after completing its criminal investigation, TCSO's criminal

investigation unit ("CID") determined that the allegation were credible that Inmate

Johnson had raped Plaintiff. *See, e.g.,* Randall Depo. (Ex. 13) at 17:23 – 18:11.   Inmate

Johnson was charged with First Degree Rape in connection with the September 27, 2011

incident involving Plaintiff. *Id.* at 16:15-17; *see also* Dkt. #82-12.

       **24.**   Sheriff Glanz's own expert witness, Jeff Schwartz ("Dr. Schwartz"),

opines that Inmate Johnson raped Plaintiff. *See* Schwartz Depo. (Ex. 2) at 12:11-14 ("Q.

And it is your view that [Plaintiff] was raped? … THE WITNESS: Based on the evidence

in the case file that is my opinion."). Dr. Schwartz's opinion in this regard is well-supported by the evidence. *See, e.g.,* Incident Report (Ex. 5); Preliminary Hearing Tr., 11/15/11 (Ex. 11); TPD Sexual Assault Report (Ex. 12); IA Report (Ex. 1); Randall Depo. (Ex. 13) at 17:23 – 18:11.  While Plaintiff briefly "recanted" the allegation of nonconsensual rape during an improper *ex parte* interview with TCSO deputies, conducted on March 26, 2012,[2] she has since clarified that she briefly recanted because she was scared for the safety of her family. *See* Plaintiff Depo. (Ex. 14) at 121:23 – 123:2.  Furthermore, as Dr. Schwartz testified, Plaintiff's brief recantation during the *ex parte* interview is simply "not consistent with … almost all of the evidence in the case file…."  Schwartz Depo. (Ex. 2) at 11:25 – 12:9.  As Dr. Schwartz observed,  "almost all of the evidence in the case file is consistent with the fact that [Plaintiff] was, in fact, raped." *Id.*

**25.**    There have been multiple instances of sexual misconduct in the medical unit, in addition to the rape of Plaintiff.  In 2008, there was a documented incident of sexual misconduct involving a juvenile female inmate. *See* Ltr. Frm Glanz to Swinderski, 3/23/11, Exec. Summary and Data Request (Ex. 19) at GLANZ-LP4004 – 4005.  In this instance, there was a male nurse who had been spying on a 15-year-old girl while she was naked in the medical unit shower. *Id.* at 4005; Glanz Depo. (Ex. 16) at 133:14-17. Sheriff Glanz would have been made aware of this incident around the time that it happened. *See id.* at 132:16 – 133:5.  Sheriff Glanz acknowledges that if video surveillance equipment had been installed in the medical unit, it would have recorded the

---

[2]    This *ex parte* interview was conducted at the Jail *after* this lawsuit had been filed. Counsel for Plaintiff was not informed of the interview nor given any opportunity to be present during the interview.

misconduct and "may" have discouraged staff from engaging in sexual misconduct to begin with. *See id.* at 137:4-13. Nevertheless, even after this incident came to light, Sheriff Glanz and TCSO made *no changes* in the way that juvenile female inmates were supervised in the Jail. *Id.* at 133:18-22. *See also* Robinette Depo. (Ex. 7) at 86:4-12 (emphasis added). TCSO did not install any video surveillance equipment to the medical unit after it was determined that a male nurse had been watching a 15-year-old girl while she showered. *Id.* at 91:17-21.

On June 11, 2010, at the conclusion of an IA investigation into the sexual assault of another juvenile female inmate housed in the medical unit -- LaDona Poore -- TCSO Sergeant Rob Lillard issued a memo noting that a criminal investigation was ongoing and indicating that criminal charges would be filed. Memo, 6/11/10 (Ex. 17) at GLANZ-LP0034; *See also* Poore Incident Report (Ex. 18) at GLANZ-LP0169. According to Sheriff Glanz, Sergeant Lillard and the TCSO investigators found the allegations *"credible"* that Ms. Poore had been sexually assaulted. *See* Glanz Depo. (Ex. 16) at 71:16-23 (emphasis added). TCSO recommended to the District Attorney that criminal charges be filed against the mail assailant, Seth Bowers, for sexually assaulting Ms. Poore. *See* Glanz Depo. (Ex. 16) at 91:12-13. TCSO does not "casually" recommend that criminal charges be filed against an employee for sexual assault. *Id.* at 91:21-25. TCSO investigators would not have recommended that criminal charges be filed against Bowers unless they believed an offense had been committed. *Id.* at 71:24 – 72:2.

Lindsy Shaver ("Shaver") was incarcerated at the Jail from March 30, 2010 through May 21, 2010. *See* Poore Incident Report (Ex. 18) at GLANZ-LP0170; Shaver Depo. (Ex. 20) at 10:18-21. Shaver was a juvenile female inmate. *See* Glanz Depo. (Ex.

16) at 94:20-23.  Shaver was housed in the Jail's medical unit. *See* Poore Incident Report (Ex. 18) at GLANZ-LP0170-171.  In early April 2010, Shaver witnessed Bowers expose his erect penis. *See* Shaver Depo. (Ex. 20) at 4:6-22.  Bowers watched Shaver when she was naked in the bathtub. *Id.* at 53:12-18; 125:6-14.  Shaver's allegations were investigated by TCSO. *See* Poore Incident Report (Ex. 18) at GLANZ-LP0170-171.

Despite these known and substantial risks of sexual assault faced by female inmates in the medical unit, TCSO took no discernable action to alleviate the risks.  *See, e.g.,* Robinette Depo. (Ex. 7) at 112:18 – 113:6.

**30.**    Plaintiff testified that: (A) there "shouldn't have been blind spots"; (B) D.O. Johnson "should have known well enough to do her job and not let an inmate walk everywhere he wants to walk"; (C) she was hurt and no one was there to help her; and (D) Defendants are responsible for the rape because they are "supposed to know what's going on" and did not learn from previous incidents. Plaintiff Depo. (Ex. 14) at 109:7-17; 111:9-14.

**31.**    "[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." *Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir. 1998).  Mr. Eiser's opinions are not based upon TCSO's written policies, but rather TCSO's "practice and custom". Eiser Depo. (Ex. 8) at 151:20-24.

**32.**    In Mr. Eiser's experience, there are "a lot of accredited facilities that have really, really bad operations." Eiser Depo. (Ex. 8) at 181:9-23.

**33-38.**  *See* Stat. of Facts, ¶ 31, *supra.*

**39-49.** The designation of the Jail as a "low incidence" facility is of little, if any, relevance. This is primarily because the sexual misconduct statistics relied upon to make the "low incidence" determination were for the facility as a whole, and were not focused on the medical unit. The medical unit, which is at issue here, is where most of the sexual misconduct occurs at Jail.

Additionally, the Jail was identified as a "low incidence" facility due to the under-reporting of investigated incidences of sexual misconduct. On March 29, 2011, Sheriff Glanz and TCSO provided a report and materials to the United States Department of Justice's ("DOJ") Prison Rape Elimination Act ("PREA") Review Panel concerning sexual abuse at the Jail. *See* Ltr. Frm Glanz to Swinderski, 3/23/11, Exec. Summary and Data Request (Ex. 19) at GLANZ-LP3982 – 4015. On September 16, 2011, Sheriff Glanz testified before the Review Panel in Washington, D.C., and attested under oath that the information and data he provided to DOJ was accurate and truthful. *See* Glanz Depo. (Ex. 16) at 125:11 – 126:21; Review Panel Hearings Tr., 9/16/11 (Ex. 21) at 410:1-12. Nonetheless, the information that Sheriff Glanz provided to DOJ was untruthful and inaccurate in several respects. For instance, the DOJ Review Panel asked that Sheriff Glanz provide certain information about each and every investigation involving alleged staff on inmate (or "SOI") sexual abuse at the Jail in the calendar years 2008, 2009 and 2010. *See* Ltr. Frm Glanz to Swinderski, 3/23/11, Exec. Summary and Data Request (Ex. 15) at GLANZ-LP4004. Sheriff Glanz understood that this request from DOJ encompassed each alleged SOI sexual abuse incident that was investigated at the Jail, whether the investigation was full or cursory. *See* Glanz Depo. (Ex.1) at 128:10-16. Chief Robinette testified before the DOJ Panel that there were only two (2) instances of

SOI sexual abuse at the Jail, one in 2008 and one in 2009. *See, e.g.,* Robinette Depo. (Ex. 7) at 65:11-17.   TCSO also provided a written report to DOJ, asserting that there were only two investigations of SOI sexual misconduct at the Jail, one in 2008 and one in 2009. *Id.* at 67:2-7; *see also* Ltr. Frm Glanz to Swinderski, 3/23/11, Exec. Summary and Data Request (Ex. 15) at GLANZ-LP4004-05; Report on Sexual Victimization (Ex. 22) at GLANZ-LP3729.   Sheriff Glanz and TCSO further reported to DOJ that no alleged SOI sexual abuse was investigated in 2010. *See* Ltr. Frm Glanz to Swinderski, 3/23/11, Exec. Summary and Data Request (Ex. 15) at GLANZ-LP4004 - 4005.   Thus, ***Sheriff Glanz clearly failed to report the incidents involving Ms. Poore and Inmate Shaver*** that were fully investigated in 2010.   *See* Glanz Depo. (Ex. 16) at 128:21 – 129:1; 129:8-9. There is additional documentation of sexual abuse complaints that were investigated, but not reported to the DOJ Panel. *See, e.g.,* Request Report (Ex. 23) at GLANZ-LP2172 – 2183.   For instance, on November 16, 2009, an inmate complained that a D.O. groped his genitals at least six times and laughed. *Id.* at GLANZ-LP2172.   While this November 16, 2009 complaint of SOI abuse was investigated, TCSO failed to report it to DOJ. *See* Robinette Depo. (Ex. 7) at 68:18-24.   On September 17, 2010, an inmate complained of sexual harassment by a D.O. *See, e.g.,* Request Report (Ex. 23) at GLANZ-LP2174. Again, while this complaint was investigated, it was not reported to the DOJ Panel. *See* Robinette Depo. (Ex. 7) at 69:6-17.

**50-55.**  Following the withdrawal of the January 14, 2012 grievance ("January 14 Grievance"), on January 27, 2012, Plaintiff, through her counsel, sought to re-assert and renew the January 14 Grievance. *See* Email from Blakemore to Fortney, 1/27/12 (Ex. 24). However, TCSO refused to treat the January 14 Grievance as renewed and re-asserted. *Id.*

After TCSO made clear its refusal to treat the January 14 Grievance as renewed, Plaintiff filed another grievance regarding the September 27, 2011 rape on February 1, 2012 ("February 1 Grievance"). *See* February 1 Grievance (Ex. 25).  On February 3, 2012, TCSO denied Plaintiff's February 1 Grievance. *Id.*  On February 7, 2012, Plaintiff appealed the denial of her Grievances on the grounds that TCSO has rendered any administrative remedies unavailable by "'prevent[ing], thwart[ing], or hinder[ing]'" Plaintiffs "'efforts to avail [her]self of [any] administrative remedy.'" *See* Dkt. #82-28 at 1 (quoting *Little v. Jones,* 607 F.3d 1245, 1250 (10th Cir. 2010)).  On February 9, 2012, TCSO, through Captain Weigel, denied Plaintiff's appeal, without comment. *Id.* at 6.

### B.  Additional Facts Precluding Summary Judgment

**1.**    Sheriff Glanz agrees that "simply being female is a risk factor" for sexual abuse.  *See* Glanz Depo. (Ex. 16) at 24:3-10; 24:23 – 25:6; 25:16 – 26:5; and 26:18-23.

**2.**    It is proven that there are "very few" assaults on inmates under "direct supervision". *See* Glanz Depo. (Ex. 16) at 57:16-21.  However, the medical unit is *not* a "direct supervision" unit. *See, e.g.,* Robinette Depo. (Ex. 7) at 13:1-16.  Linear units, that are not direct supervision units, like the medical unit, require more staffing. *See* Eiser Depo. (Ex. 8) at 61:2 – 62:3.

**3.**    Sheriff Glanz agrees that "[b]ecause *eliminating blind spots is a key to effective supervision*" jail management is required to "examine areas where sexual abuse has occurred to assess whether physical barriers, inadequate staffing, or *lack of monitoring technology* may have contributed to its occurrence and to undertake needed improvements." *See* Glanz Depo. (Ex. 16) at 27:3-13 (emphasis added).  It is critical that people in the Jail be aware that their conduct can be, or will be, detected. *See id.* at

179:15-19.   Nonetheless, Sheriff Glanz and TCSO have *no process* in place to examine whether there are blind spots within the Jail. *See id.* at 152:19-25.   *At all pertinent time periods, there was no video surveillance equipment within the medical unit* (with the limited exception of the suicide cells). *See, e.g.,* D.O. Johnson Depo. (Ex. 3) at 48:10-16; D.O. Thomas Depo. (Ex. 6) at 24:3-12; Moses Depo. (Ex. 26) at 12:16 – 13:20; Anjorin Depo. (Ex. 27) at 17:17-20; Hutton Depo. (Ex. 28) at 31:15-20.

   **4.**      In addition to the instances involving Plaintiff, Ms. Poore, Shaver and the 15-year-old juvenile inmate, there have been other instances of reported sexual misconduct within the Jail's medical unit.   Officer Cherry Anjorin, who worked in the medical unit for years, has described the unit as follows:

> there were a lot of reported cases of the nurses having sex in the back medical rooms because there [are no cameras] back there. I mean, you can go back there and sleep if you want to because there is no one…. And so you have inmates just moving around in medical, and it was mostly only one [D.O.] in there so you couldn't watch all the places. So there were inmates coming out of the rooms, the back rooms with nurses….

Anjorin Depo. (Ex. 27) at 33:5-25.   A nurse was caught in a sexual relationship with an inmate named Chester Washington. *See* Moses Depo. (Ex. 26) at 43:3 – 44:17.   Officer Anjorin observed a therapist inappropriately directing female juvenile inmates remove their clothes. Anjorin Depo. (Ex. 27) at 48:7-22.   Inmate Dolan Prejean was sexually assaulted by a nurse in the medical unit, and this sexual assault was investigated by TCSO. *See* Prejean Depo. (Ex. 29) at 23:14 – 24:5; 25:7 – 29:14.

   **5.**      Robin Mason, a Registered Nurse who worked at the Jail from March 2009 through October 19, 2010, has described the medical unit as follows:

> There was … a ***persistent lack of security within the medical unit*** at the Jail. Generally, it was well-known by inmates and staff alike that the medical unit was not monitored by video surveillance equipment.  ***The lack of video surveillance***

17

> ***gave rise to an atmosphere of lawlessness within the medical unit.*** I frequently saw unattended inmates enter the medical unit by simply following staff through the door.  The door to the medical unit was often "rigged" so that unsupervised inmates could, and would, enter the medical unit. … It was well-known that improper sexual misconduct took place in the exam rooms between inmates and staff.  On several occasions, I complained to Chief Deputy Michelle Robinette about these security deficiencies, but I observed no changes made.

Mason Aff. (Ex. 30) at ¶ 20 (emphasis added).

6.      Shannon Moody ("Ms. Moody"), a former D.O. at the Tulsa County Jail, has given a sworn Affidavit, testifying to numerous incidents of physical assaults by officers on inmates and sexual misconduct in areas of the Jail where there are no cameras (i.e., blind spots). *See* Moody Aff. (Ex. 31).  The Moody Affidavit was publicly filed in litigation involving TCSO in May 2010. *Id.*

7.      It is Mr. Eiser's opinion that both D.O. Johnson and D.O. Thomas disregarded known or obvious and substantial risks to Plaintiff's safety. *See* Eiser Depo. (Ex. 8) at 219:2 – 220:8.  Mr. Eiser further testified that the Tulsa County Jail operates under a "culture of difference". *See, e.g. id.* at 174:19 – 175:22; 177:6-25; 179:1-10.  Mr. Eiser bases this opinion on his review of the case at bar, as well as his review of the case involving Ms. Poore. *Id.*  Mr. Eiser was most troubled by TCSO's failure to conduct any "administrative review" after the incidents involving Ms. Poore and Plaintiff came to light. *Id.* at 177:6 – 179:10. *See also id.* at 24:22 – 25:20 (general explanation of the administrative review process).  According to Mr. Eiser, after each critical incident in a correctional setting, the responsible officials must conduct an administrative or operational review of their policies, practices and "physical plant" to determine what measures might be taken to prevent similar incidents from happening in the future. *Id.*

**8.**     TCSO failed to conduct any administrative review or remedial action that could have prevented the rape of Plaintiff.  For instance, at the point that Sheriff Glanz knew that there were credible allegations that Bowers had sexually assaulted Ms. Poore in the medical unit, he had no understanding of what might be done to prevent this type of sexual misconduct in the future. *See* Glanz Depo. (Ex. 16) at 77:1-5.  At the conclusion of the investigation into whether Bowers has assaulted Ms. Poore, Sheriff Glanz does not recall whether he inquired as to how the assaults happened or how such incidents could be prevented in the future. *See* Glanz Depo. (Ex. 16) at 74:16-22; 77:10-23.  Sheriff Glanz never asked anyone how it was that Bowers was able to enter Ms. Poore's cell without someone else being present. *See* Glanz Depo. (Ex. 16) at 80:24 – 81:2.  The only "change" Sheriff Glanz / TCSO made in response to the "credible" allegations that Bowers assaulted Ms. Poore was to recommend that staff be more attentive:

> Q. … My question is, after these events, after you find out that there -- that your investigation has determined that it was credible that a sexual assault of a juvenile female took place in your jail, other than recommending that staff be more attentive, were there any other recommendations for changes to be made to avoid this happening in the future?
>
> A.     I can't specifically say that any that I'm aware of were made.

Glanz Depo. (Ex. 16) at 89:19 – 90:2; *see also id.* at 88:14-17.

**Argument**

**I.     DEFENDANTS ARE *NOT* ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONSTITUTIONAL CLAIMS**

**A.     The General Legal Framework of Plaintiff's Claims: Cruel and Unusual Punishment (the Objective and Subjective Components)**

"The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including

19

reasonable safety from serious bodily harm." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)).   Where a plaintiff asserts a cruel and unusual punishment claim, she must allege, and ultimately prove that: (1) "the alleged injury or deprivation [is] sufficiently serious" (known as the "objective component"); and (2) "the prison official . . . ha[d] a sufficiently culpable state of mind to violate the constitutional standard" (known as the "subjective component"). *Tafoya,* 516 F.3d at 916.

"[R]ape and sexual assault [in a correctional setting] are sufficiently serious to satisfy the objective component of a deliberate indifference claim." *Poore v. Glanz,* 2012 WL 1536933, *3 (N.D. Okla. Apr. 30, 2012) (citing *Tafoya,* 516 F.3d at 916; and *Hovater v. Robinson,* 1 F.3d 1063, 1068 (10th Cir. 1993)). In the case at bar, Defendants do not assert that Plaintiff has failed to establish the objective component of her cruel and unusual punishment claim.

The "state of mind" required by the subjective component is one of "deliberate indifference to inmate health and safety." *Farmer,* 511 U.S. at 834.  In order to establish "deliberate indifference," the plaintiff must show that the defendant official "knows of and disregards an excessive risk to inmate health or safety."  *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005).  An official is deliberately indifferent where he *"has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." Tafoya,* 516 F.3d at 916 (emphasis added).   "The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Id.* (citing *Farmer,* 511 U.S. at 843) (emphasis in original).  "Although deliberate indifference is a subjective

20

inquiry, a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Id.* "Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001). *See also Farmer,* 511 U.S. at 842 (A "fact finder may conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious."). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to him *or because all prisoners in his situation face such a risk." Farmer,* 511 U.S. at 843 (emphasis added).

Defendants' summary judgment arguments in this case are focused on the subjective component of Plaintiff's Eighth Amendment claim.

**B.     Plaintiff Has Shown Underlying Constitutional Violations by D.O. Johnson and D.O. Thomas (as Well as Institutional Violations)**

Defendants' first argument is that "Plaintiff's allegations [against D.O. Johnson and D.O. Thomas] must fail because she cannot establish the subjective *intent* of either Defendant." MSJ at 15 (emphasis added).  Defendants go so far as to suggest that Plaintiff must establish that D.O. Johnson and/or D.O. Thomas "arranged for Inmate Johnson to sexually assault Plaintiff…." *Id.*  Defendants' argument must be rejected as it urges a higher degree of fault than that of deliberate indifference. It is well established that "'[d]eliberate indifference,' while requiring a higher degree of fault than negligence, or even gross negligence, … remains lower than the intentional and malicious infliction of injury…." *Berry v. City of Muskogee, Okl.,* 900 F.2d 1489, 1495-96 (10th Cir. 1990). As a matter of law, Plaintiff need not show that any Defendant subjectively intended, or

arranged for, Inmate Johnson to rape her. Rather, it is Plaintiff's claim that Defendants were deliberately indifferent by disregarding known or obvious and substantial risks to her safety and well-being.  *See Mata,* 427 F.3d at 751; *Tafoya,* 516 F.3d at 916.[3]  When one views the facts of this case under this proper legal lens, it is clear that D.O. Johnson and D.O. Thomas are *not* entitled to summary judgment.

In previously denying the Motion to Dismiss filed by D.O. Johnson and D.O. Thomas, this Court reasoned as follows:

> Plaintiff argues that she has alleged an "obvious and excessive risk to Plaintiff's safety that was known and disregarded" by Officers because the "medical unit, and tub room specifically, is a known 'blind spot' that is unmonitored by surveillance equipment" and that the medical unit "is one area where of the Jail where male and female inmates come into close proximity with each other." ….

> Plaintiff has stated a plausible claim for deliberate indifference by the Officers. Plaintiff has alleged that the Officers were aware of the lack of surveillance of the tub room and that certain male inmates, including Inmate Johnson, had access to the tub room. Plaintiff alleged that Officers left Plaintiff shackled in the tub room while it was unlocked and unmonitored, which could be deemed an obvious risk. These facts could potentially demonstrate that Officers were (1) actually aware of facts from which the inference could be drawn that Plaintiff faced a substantial risk of serious harm, (2) that Officers drew such inference, and (3) that Officers failed to take reasonable steps to alleviate that risk such as locking the door, removing Plaintiff's shackles, or removing Plaintiff from the unlocked tub room.

*Henderson v. Glanz,* 2012 WL 5931546, *3-4 (N.D. Okla. Nov. 27, 2012).   Now,

---

[3]      It is telling that Defendants do not cite the *Tafoya* decision in their Motion for Summary Judgment.  *Tafoya* is the Tenth Circuit's leading case regarding sexual assault in a correctional setting.  While ignoring *Tafoya*, Defendants rely primarily on Eighth Circuit and Seventh Circuit authority.  *See, e.g.,* MSJ at 14-17. None of this authority is binding on this Court.   More to the point, because there is applicable Tenth Circuit authority, Eighth and Seventh Circuit decisions have little, if any, bearing on the issue of qualified immunity. *See, e.g.,  Archuleta v. Wagner,* 523 F.3d 1278, 1283 (10th Cir. 2008) (existence of a "clearly established" constitutional right -- for qualified immunity purposes -- is determined "by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits….").   Qualified immunity is discussed more fully *infra* in Argument, Proposition II.

Plaintiff's "plausible claim" of deliberate indifference has been established by the evidence.

First, the evidence establishes that D.O. Johnson and D.O. Thomas knew that the tub room was not monitored by surveillance equipment. *See, e.g.,* Plf's Stat. of Facts (B) ¶ 3, *supra.* In fact, it is undisputed that the only cameras in the medical were the cameras placed in the suicide cells. *Id. See also* Mason Aff. (Ex. 30) at ¶ 20 ("Generally, it was well-known by inmates and staff alike that the medical unit was not monitored by video surveillance equipment.").

Second, the evidence shows D.O. Johnson and D.O. Thomas knew, or it was obvious, that Inmate Johnson had access to the tub room.  D.O. Johnson admits that she left the tub room door unlocked. *See, e.g.,* D.O. Johnson Depo. (Ex. 3) at 45:1-3; 46:14 – 47:14; IA Report (Ex. 1) at GLANZ-AH0308.  And while D.O. Johnson has attempted to muddy the record with respect to her knowledge, the evidence strongly indicates that she knew the tub room door was unlocked.  *See, e.g.,* D.O. Johnson Depo. (Ex. 3) at 47:7-14 ("Q. …[Y]ou knew the door was unlocked, right? *** THE WITNESS: Okay. *Yes, I unlocked the door.* Yes, the medical emergency happened.  Yes, I went down to the treatment room.  It is always my practice to lock the door.  *I didn't lock the door."*) (emphasis added).  Despite her equivocation on the point, D.O. Johnson's knowledge is, at the very least, established by circumstantial evidence. *See, e.g., DeSpain,* 264 F.3d at 975.  D.O. Johnson further knew that Inmate Johnson was in the medical unit, unsecured and unrestrained, in a position where he was likely to see her unlock the tub room door. *See* Plf's Stat. of Facts (A) at ¶ 11, *supra.*  What is more, D.O. Johnson left the main hall of the medical unit without first securing, or "locking down", Inmate Johnson. *Id.* at ¶¶

12-16. D.O. Johnson admits that she left Inmate Johnson unrestrained and unsupervised by detention staff. *See* D.O. Johnson Depo. (Ex. 3) at 52:23 – 53:5. Taken together, this evidence establishes, that D.O. Johnson knew, or it was obvious, that Inmate Johnson had access to the tub room.

In addition, before D.O. Thomas left the medical unit, he failed to secure the male inmates, despite knowing that Plaintiff was in the tub room. *See* Plf's Stat. of Facts (A) at ¶¶ 12-16, *supra.*

Third, the evidence establishes that D.O. Johnson and D.O. Thomas "left Plaintiff shackled in the tub room while it was unlocked and unmonitored…." *Henderson,* 2012 WL 5931546 at *4. Indeed, D.O. Johnson admits that she violated TCSO policy by leaving Plaintiff alone and handcuffed in the unlocked room. *See* Plf's Stat. of Facts (A) at ¶ 17, *supra.* Moreover, TCSO's own IA investigator determined that D.O. Thomas left the tub room unsecure and "diminish[ed] the ability of officers to properly supervise the [medical] unit" by leaving his post. IA Report (Ex. 1) at GLANZ-AH0310. D.O. Johnson and D.O. Thomas' conduct also violated the Oklahoma Jail Standards, which provide that "[p]risoners placed in restraints shall not be left without required supervision." OAC 310:670-5-2(24).

In sum, the evidence demonstrates that D.O. Johnson and D.O. Thomas "were (1) actually aware of facts from which the inference could be drawn that Plaintiff faced a substantial risk of serious harm, (2) that [they] drew such inference, and (3) that [D.O. Johnson and D.O. Thomas] failed to take reasonable steps to alleviate that risk such as locking the door, removing Plaintiff's shackles, or removing Plaintiff from the unlocked

tub room." *Henderson,* 2012 WL 5931546 at *4.[4]

There is additional evidence that tends to prove the existence of an underlying constitutional violation.  For instance, both D.O. Johnson and D.O. Thomas testified that it was "common" for one D.O. to be called out of the medical unit to perform other duties. *See* Plf's Stat. of Facts (A) ¶¶ 7-8.  Yet, it is clear from their reckless conduct on September 27, 2011, that neither D.O. Johnson nor D.O. Thomas had any plan in place to assure that back-up supervision was available or that inmates would be secured and adequately supervised in such "common" instances when the unit was single-staffed.  There is also the fact that TCSO inexplicably granted Inmate Johnson trustee status after identifying him "extreme escape risk" and "[a]ssaultive". *See* Plf's Stat. of Facts (A) ¶¶ 9-10, *supra.*  While TCSO expressly stated that "extreme caution" should have been used when moving Inmate Johnson, TCSO exhibited *no caution* on September 27, 2011 in allowing Inmate Johnson to roam freely unrestrained and unescorted to the kitchen, and then to the medical unit, where he brutally raped Plaintiff. *Id.*  In violation of TCSO policy and the Oklahoma Jail Standards, TCSO failed to even monitor, let alone supervise, Inmate Johnson's movements. *See, e.g.,* OAC 310:670-5-3(a).  Clearly, it was known, institutionally, that Inmate Johnson posed a substantial risk of harming others.

---

[4]     While Defendants point to isolated deposition testimony from Mr. Eiser that D.O. Johnson and D.O. Thomas were not "specifically" "deliberately indifferent" to Plaintiff (MSJ at 17-18), deliberate indifference is a legal term of art, and Mr. Eiser is not an attorney. The very question posed to Mr. Eiser was improper as it called for an inadmissible legal conclusion which Mr. Eiser is not qualified to give. In any event, Mr. Eiser stated in his deposition that  both D.O. Johnson and D.O. Thomas disregarded known or obvious and substantial risks to Plaintiff's safety. *See* Eiser Depo. (Ex. 8) at 219:2 – 220:8. Thus, it is clearly Mr. Eiser's opinion that D.O. Johnson and D.O. Thomas' conduct meets the definition of deliberate indifference.  Further, Mr. Eiser was highly critical of D.O. Johnson and D.O. Thomas' many egregious failures throughout his deposition. *See, e.g.,* Eiser Depo. (Ex. 8) at 121:4-7; 232:8 – 233:12; 240:11-20; 245:1-12.

Yet, TCSO utterly and shockingly disregarded those risks, by allowing Inmate Johnson unfettered, unrestrained and unsupervised movement through the facility.

Plaintiff has established underlying constitutional violations.

**C.     Sheriff Glanz is *Not* Entitled to Summary Judgment in His Individual *or* Official Capacity**

Plaintiff has brought her claims against Sheriff Glanz in his individual capacity under a supervisory liability theory.  It is well-established that officials, such as Sheriff Glanz, "may be held *individually liable for policies they promulgate, implement, or maintain that deprive persons of their federally protected rights." Dodds v. Richardson,* 614 F .3d 1185, 1207 (10th Cir. 2010) (emphasis added). "To establish a claim of supervisory liability under § 1983, a plaintiff must plead and prove that '(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind [i.e., "deliberate indifference"] required to establish the alleged constitutional deprivation.'" *Poore v. Glanz,* 2012 WL 728199, *3 (N.D. Okla. Mar. 6, 2012) (quoting *Dodds,* 614 F.3d at 1199).

Plaintiff has also brought claims against Sheriff Glanz in his official capacity.  A claim against a state actor in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010).   The *Dodds* Court, while recognizing the difference between supervisory liability and municipal liability, acknowledged the similarities between the standards. *Dodds,* 614 F.3d at n. 10.  Under **both** standards, the plaintiff must plead and prove the existence of a municipal policy or custom and an

affirmative causal nexus between the policy or custom and the constitutional injury. *Dodds,* 614 F .3d at 1202.

Applying these standards in the case-at-bar, Sheriff Glanz is not entitled to summary judgment in his individual or official capacities.

### 1.   Plaintiff Need Not Prove that Sheriff Glanz Had Direct "On-The-Ground" Control Over Plaintiff

Defendants first argue that summary judgment is appropriate on Plaintiff's individual capacity claims because "[n]one of Plaintiff's factual allegations provides grounds for concluding that Sheriff Glanz was *directly involved* in placing Plaintiff in the tub room or supervising Inmate Johnson in the medical unit." MSJ at 19 (emphasis added). Here, Sheriff Glanz exhibits -- perhaps disingenuously -- a fundamental misunderstanding regarding both the nature of the allegations brought against him in his individual capacity and the legal contours of supervisory liability under § 1983. Plaintiff need not prove such direct on-the-ground control to adequately establish her supervisor liability claim.  In articulating the Tenth Circuit's supervisor liability standard, the *Dodds* Court cited and relied on the United States District Court for the District of Colorado's decision in *Davis v. City of Aurora,* 705 F.Supp.2d 1243 (D. Colo. 2010). *Dodds,* 614 F .3d at 1200.  The *Davis* Court pertinently held and reasoned as follows:

> The exercise of control which may create the 'affirmative link' [between the supervisor and the violation] *does not need to be* the sort of *on-the-ground, moment-to-moment control* that defendants appear to suggest.  Rather, the establishment or utilization of an *unconstitutional policy or custom* can serve as the supervisor's 'affirmative link' to the constitutional violation . . . .  *[W]here an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application.*

*Davis,* 705 F.Supp.2d at 1263-64 (emphasis added).   Thus, the Court should reject Defendants' argument that Plaintiff must prove that Sheriff Glanz's involvement in Plaintiff's "on-the-ground, moment-to-moment" treatment at the Jail.

>    **2.     There is Ample Evidence of an Affirmative Link Between Plaintiff's Injuries and Policies or Customs Which Sheriff Glanz Possessed Responsibility For**

In essence, it is Sheriff Glanz's position that because he has adopted certain written policies concerning sexual assault and sexual assault training materials, he is not, and cannot be, held liable in his individual or official capacities. *See* MSJ at 20-23.   This is a superficial argument that cannot withstand even minimal scrutiny. *See, e.g., Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.").   Ineffectual written policies and training manuals are of little comfort to Plaintiff, and the other victims of sexual abuse in the medical unit, who have been "thrown to the wolves" in a chaotic area of the Jail that is inadequately supervised, monitored and staffed.   Sheriff Glanz's written policies are an "empty gesture <u>without</u> corresponding <u>supervision</u>…." *Tafoya,* 516 F.3d at 919.

"A municipal policy or custom may take the form of … an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; …. the decisions of employees with final policymaking authority; …. the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (10th Cir. 2010) (internal quotations and

citations omitted). Plaintiffs' claims against Sheriff Glanz stem from a pattern sexual misconduct and security lapses within the medical unit, continual failure to adequate secure and supervise the medical unit and Sheriff Glanz's policy decisions not to remediate these identified deficiencies in deliberate indifference to the safety of inmates like Plaintiff. These policies and customs, for which Sheriff Glanz was responsible, were the moving force behind Plaintiff's injuries.

### a. A Pattern of Sexual Misconduct and Security Lapses in the Medical Unit; A "Culture of Indifference"

In this case, there is an established pattern of sexual misconduct and sexual assaults within the medical unit, in addition the rape of Plaintiff. *See* Plf's Stat. of Facts (A) ¶¶ 25, 39-49; (B) ¶¶ 4-5, 8. This pattern includes the incidents involving Ms. Poore, Shaver and the 15-year-old juvenile female inmate. *Id.* More generally, there is evidence of a persistent lack of security within the medical unit, including unsupervised and unrestrained inmates entering the medical unit and moving freely through the unit. *Id.* Sheriff Glanz/TCSO knew of the pattern of sexual abuse and security lapses, but took no discernable effort to remedy the problem, or even inquire as to how such problems *could* be remedied. *Id.* This failure to address the underlying risks to inmate safety, in the face of egregious misconduct and inadequate supervision, is what Mr. Eiser refers to as a "culture of indifference". *See* Eiser Depo. (Ex. 8) at 174:19 – 175:22; 177:6-25; 179:1-10. This "culture of indifference" amounts to a a an unconstitutional custom, fostered by Sheriff Glanz's repeated decisions, as the final policymaker, to take no remedial action.

### b. Inadequate Supervision / "Blind Spots"

The evidence establishes that the entire medical unit, with the exception of the suicide cells, is a "blind spot" that is not monitored by video surveillance equipment. In

addition, the medical unit is not a direct supervision unit and is frequented by male and female inmates, making supplemental supervision all the more important.   Considering the known pattern of sexual misconduct and assaults in the medical unit, coupled with the fact that the medical unit is commonly supervised by a single D.O., surveillance equipment should have been installed in the medical unit well in advance of September 27, 2011.  Sheriff Glanz acknowledges that "eliminating blind spots is a key to effective supervision…." Glanz Depo. (Ex. 16) at 27:3-13.   Nevertheless, the record shows that Sheriff Glanz did *nothing* to even evaluate the blind spots in the medical unit, let alone take any measures to eliminate them.  Indeed, even after it came to light that a male nurse had been spying on a 15-year-old girl while she was showering, that Ms. Poore had been sexually assault and that Shaver had been subjected to sexual misconduct, Sheriff Glanz and TCSO made no changes to the way that inmates were supervised in the medical unit, and did not install any surveillance equipment.

The Tenth Circuit faced similar facts in the *Tafoya* case.  In *Tafoya,* the sheriff of Huerfano County, Colorado, Sheriff Salazar, installed surveillance equipment at the Huerfano County Jail after a series of assaults in 1998.  *See Tayfoya,* 516 F.3d at 919. However, the Tenth Circuit found that Salazar "knew that blind spots remained even after the installation of the new cameras, and knew that having some cameras in the jail was not enough to deter assaults in unmonitored areas."  *Id.*  The *Tayfoya* Court additionally found and reasoned as follows:

> Detention officers and inmates were aware of the unmonitored locations where illegal activity could take place out of sight of personnel in the control room.  The kitchen where Ms. Tafoya was assaulted contained only a malfunctioning audio surveillance device, leaving Ms. Tafoya vulnerable to an attack.  Sheriff Salazar claims that he did not install more surveillance cameras because of budget constraints.  ***Whether or not he failed to install more cameras out of deliberate***

> **indifference or lack of funding is a genuine issue of material fact to be considered by a jury.**

*Id.* at 920 (emphasis added).   Here, Sheriff Glanz had a policy and practice of maintaining -- and failing to address and eliminate -- unsafe blind spots in the medical unit.  And there is an affirmative link between this policy and practice and the violation of Plaintiff's constitutional rights.

### c.   Failure to Enforce Policies Necessary to the Safety of Inmates / Staffing

It is well established that "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference."  *Tafoya,* 516 F.3d at 919 (citing *LaMarca v. Turner,* 995 F.2d 1526, 1536 (11th Cir.1993) (finding deliberate indifference where prison official "failed to ensure that his direct subordinates followed the policies he established"), and *Goka v. Bobbitt,* 862 F.2d 646, 652 (7th Cir.1988) (holding that failure to enforce a policy where the policy is critical to inmate safety may rise to the level of deliberate indifference)).  Here, the evidence establishes that Sheriff Glanz did not enforce policies that were necessary to the safety of inmates like Plaintiff.

 For example, it was TCSO's policy to double-staff the medical unit at all times for safety reasons. *See* Plf's Stat. of Facts (A), ¶¶ 7-8.  Nevertheless, in violation of this policy, it was common for detention staff to be called out of the medical unit, leaving the one officer to supervise the entire unit.  *Id.*[5]  In Plaintiff's case, it was clear that Sheriff Glanz / TCSO had no plan in place to provide backup supervision (either human or

---

[5]     It is clearly established that a jail official may be personally liable for injuries suffered by an inmate due to the official's practice of failing to adequately staff the jail. *See, e.g., Lopez v. LeMaster,* 172 F.3d 756 at 763 (10th Cir. 1999).

electronic) in instances when the medical unit was single staffed.  Had Sheriff Glanz ensured that his staffing policy for the medical unit was enforced and provided a backup supervision plan, Inmate Johnson would not have had the opportunity to rape Plaintiff in the tub room.

Overall, the evidence demonstrates that is an affirmative link between Plaintiff's injuries and several unconstitutional policies or customs that Sheriff Glanz was responsible for.

### 3.    The Evidence Establishes Sheriff Glanz's "Deliberate Indifference"

As shown throughout this brief, the evidence demonstrates that even after specific instances of sexual misconduct and sexual assault in the medical unit came to light, Sheriff Glanz did nothing to alleviate the known, obvious and substantial risks to the safety of inmates like Plaintiff. *See, e.g., Tafoya,* 516 F.3d at 916 (An official is deliberately indifferent where he "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk.").  By definition, this is deliberate indifference.  Sheriff Glanz has exhibited a lack of the self-reflection and scrutiny necessary to protect inmates in the medical unit.  After catastrophic security breaches occurred in his medical unit, Sheriff Glanz never conducted a true administrative review in order to determine what measures might be taken (*e.g.,* video surveillance, enforcement of staffing policies) to provide better supervision and protection. Plaintiff was brutally raped as a result.  Sheriff Glanz has been deliberately indifferent to the safety of inmates like Plaintiff.

In arguing that Defendant Glanz was not deliberately indifferent, Defendants again point to TCSO's written policies and the fact that the Tulsa County Jail was

recognized as an institution with "low incidence of sexual victimization". MSJ at 19-20.

Again, the mere existence of written policies is truly meaningless under the facts of this

case.   Mr. Eiser's opinions are not based upon TCSO's written policies, but rather

TCSO's "practice and custom". Eiser Depo. (Ex. 8) at 151:20-24.   And based on the

observed "practice and custom", Mr. Eiser found a "culture of indifference".   As Nurse

Mason observed, there was "persistent lack of security" and "atmosphere of lawlessness"

within the medical unit. Mason Aff. (Ex 30) at ¶20. *See also* Plf's Stat. of Fact (A) ¶ 25;

(B) ¶ 4.  Plainly, there is a disconnect between what is written in the policies and what is

actually happening on the ground.  Further, because the finding of "low incidence" was

based on statistics across the Jail, and not focused on the medical unit, the finding is of

limited, if any, relevance.   The "low incidence" designation becomes even less

impressive when one considers that it was only obtained through Sheriff Glanz's

underreporting of sexual misconduct within the Jail. *See* Plf's Stat. of Fact (A) ¶¶ 39-49.

The failure to accurately report incidents of sexual abuse is consistent with Sheriff

Glanz's continuing failure to alleviate safety risks, and provides further evidence of a

general indifference to the safety of inmates like Plaintiff.[6]   Sheriff Glanz was

deliberately indifferent and is not entitled to summary judgment on Plaintiff's

constitutional claims.

---

[6]    Sheriff Glanz also speculates that the rape charges brought against Inmate
Johnson were dropped because "Plaintiff admitted to consensual sex with Inmate
Johnson." MSJ at 20.   It is troubling, but consistent with his pattern of deliberate
indifference, that Sheriff Glanz would suggest that Plaintiff was not raped.   While
Plaintiff briefly recanted during an improper *ex parte* interview with Sheriff's Deputies,
she has since explained that she recanted out of fear for the safety of her family. *See* Plf's
Stat. of Fact, ¶ 24.   The Sheriff's own expert believes that Plaintiff was raped, and the
evidence, including physical evidence, overwhelmingly indicates that Plaintiff was
forcibly raped. *Id.*

## II.     DEFENDANTS ARE *NOT* ENTITLED TO QUALIFIED IMMUNITY

Once a defendant asserts qualified immunity, the plaintiff bears the burden of satisfying a "'strict two-part test.'" *McBeth v. Himes,* 598 F.3d 708, 716 (10th Cir. 2010) (quoting *Bowling v. Rector,* 584 F.3d 956, 964 (10th Cir. 2009)). "The plaintiff must establish '(1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct....'" *Id.* (quoting *Bowling,* 584 F.3d at 964).  Plaintiff has established violations of a constitutional right. In addition, the constitutional rights asserted are "clearly established".  In determining whether a constitutional right is "clearly established" for the purposes of qualified immunity:

> The Supreme Court has held "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002) (quotations and alteration omitted). As this court has pointed out, "[t]he *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Casey v. City of Fed. Heights,* 509 F.3d 1278, 1284 (10th Cir.2007) (quotations omitted).

*Clark v. Wilson,* 625 F.3d 686, 690 (10th Cir. 2010).  Here, Plaintiff has raised bedrock constitutional Eighth Amendment / Cruel and Unusual Punishment principles that apply with obvious clarity to the conduct in question.  An inmate's right to be free from sexual assault is fundamental.  There is nothing novel about Plaintiff's claims. D.O. Johnson and D.O. Thomas had fair notice, and it was obvious, that leaving a shackled female inmate alone and unmonitored, in an unlocked room in an area with an unsecured, unrestrained and violent male inmate, created safety risks of a constitutional magnitude.  Sheriff Glanz had fair notice that by his continuing failure to alleviate known and obvious risks to the

34

safety of inmates like Plaintiff, he was subjecting himself to constitutional liability. Defendants are not entitled to qualified immunity.

## III.    PLAINTIFF'S CLAIMS ARE *NOT* BARRED BY THE PLRA

The Prison Litigation Reform Act ("PLRA") only requires the exhaustion of "available" administrative remedies. *See Little v. Jones,* 607 F.3d 1245, 1250 (10th Cir. 2010); 42 U.S.C. § 1997(e)(a).   Here, because Plaintiff believed she had already submitted grievances concerning the rape (which TCSO had not investigated), she initially withdrew the January 14 Grievance. *See* Dkt. #82-28.  When it became clear that TCSO had lost or discarded the previous grievances, Plaintiff sought to renew and re-assert her January 14 Grievance. *Id.*; *see also* Plf's Stat. of Facts, ¶¶ 50-55.  Without any basis, TCSO refused Plaintiff's request, in an obvious attempt to prevent and thwart her from exhausting her administrative remedies. *Id.*  At this point, Plaintiff simply filed a new grievance, the February 1 Grievance. *Id.* However, TCSO denied the February 1 Grievance and refused to investigate. *Id.*  In a last attempt to exhaust her administrative remedies, Plaintiff filed an appeal. *Id.*  The appeal was denied without comment. *Id.* "Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust." *Little,* 607 F.3d at 1250.  Here, TCSO prevented, thwarted and hindered Plaintiff's efforts at every turn, rendering the administrative remedies unavailable.  Thus, any failure to exhaust must be excused.


Respectfully submitted,


/s/ Robert M. Blakemore

35

Robert M. Blakemore, OBA #18656
Smolen, Smolen & Roytman, PLLC
701 S. Cincinnati Ave.
Tulsa, OK 74119
(918) 585-2667
(918) 585-2669 Fax
bobblakemore@ssrok.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 6th day of December 2013, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel who have entered an appearance in this action.

/s/Robert M. Blakemore
Robert M. Blakemore

36