## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ALESHIA CYRESE HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-68-JED-FHM |
| | ) | |
| STANLEY GLANZ, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This is a civil rights case brought by plaintiff Aleshia Henderson against Tulsa County Sheriff Stanley Glanz and two Detention Officers, Dalean Johnson and Michael Thomas.[1] Henderson alleges that she was raped while she was an inmate at David L. Moss Criminal Justice Center (the "Tulsa County Jail" or "Jail") as a result of the defendants' failure to observe minimal security and supervisory measures. The defendants seek summary judgment as to Henderson's solitary 42 U.S.C. § 1983 claim for violations of the Eighth and Fourteenth Amendments to the United States Constitution.

### BACKGROUND

Aleshia Henderson alleges that she was raped on September 27, 2011, in the Tulsa County Jail. Henderson, who was 20 at the time, had been booked into the Tulsa County Jail on June 3, 2011. At the time of her intake into the Jail, Henderson was identified as a "special needs" inmate; that being one who exhibits mental health issues. In the early evening of September 27, 2011, Henderson was taken to the Jail's medical unit with chest pains. The

---

[1] Henderson also named Correctional Healthcare Management of Oklahoma, Inc., Susan Pinson, and John Does I through X as defendants. Susan Pinson was dismissed via a notice of voluntary dismissal (Doc. 11) and Correctional Healthcare Management of Oklahoma, Inc. was dismissed with prejudice by joint stipulation (Doc. 85). On May 5, 2014, the Court entered an Order granting the defendants' motion to dismiss John Does I through X (Doc. 118).

medical unit consists of a main hallway with a nurses' station.  There, nurses are stationed at one end of a large desk and Detention Officers occupy the other end of the desk.  When Henderson was brought into the medical unit, Detention Officers Johnson and Thomas ("DO Johnson" and "DO Thomas") were keeping watch over the medical unit during their 12-hour shift from 7:00 a.m. to 7:00 p.m. that evening.  Upon Henderson's arrival in the medical unit at approximately 5:30 p.m., she was placed in the "tub room."  The tub room is located directly across from the side of the nurses' station at which the Detention Officers sit.  The tub room is often used as a holding cell to segregate inmates.  The door to the tub room has a single, small window that generally remains covered.  DO Thomas testified that it was the Jail's practice to lock the tub room door when it is used as a holding cell.

When Henderson was brought into the medical unit, inmate Steven Williams was in the medical unit receiving a breathing treatment.  Another inmate, Jessie Earl Johnson, was also in the medical unit, seated in a chair next to the shower room, which is adjacent to the tub room. Inmate Johnson was incarcerated in Tulsa County Jail as a result of a charge of assault and battery on a police officer and had been identified by the Tulsa County Sheriff's Office ("TCSO") as an "extreme escape risk" and worthy of "extreme caution" when being moved. (Doc. 93-9, at 9).   In spite of these warning labels, Inmate Johnson was, at the time of the incident in question, a trustee who was permitted to leave his pod without an escort officer or restraints.  Nurse Susan Pinson was in the medical unit at that time and witnessed Henderson being placed in the tub room.  Inmate Williams also testified that he observed Henderson, who

was in handcuffs and leg restraints[2], as she was brought into the medical unit and placed in the tub room.[3]

Shortly before 7:00 p.m., a medical emergency was declared in Pod J7. This prompted the need for a gurney to be requested from within the medical unit. Rather than having an inmate deliver the gurney, which was an available option, DO Thomas elected to deliver the gurney himself. Nurse Charity Chumley also responded to the medical emergency and soon returned to the medical unit with the injured inmate from J7 on the medical unit's gurney. DO Thomas had not yet returned to the medical unit. According to the TCSO investigative report, DO Johnson left the medical unit desk and accompanied Chumley and Pinson to a treatment room, which was around the corner and down the hall from the nurse's station, to assist with the injured inmate. No inmates in the medical unit were secured or locked down prior to the departures of DO Thomas or DO Johnson from the main area of the medical unit where the tub room is located. According to DO Johnson, she was aware at the time she went into the treatment room that Inmate Johnson was seated near the tub room and that he was not secured or otherwise restrained. DO Johnson further acknowledged that Inmate Johnson was in a position

---

[2]   Inmate Williams was the only witness who was certain that Henderson was fully shackled. DOs Johnson and Thomas were certain that Henderson was handcuffed, but were uncertain as to whether she was also in leg restraints. As such, Inmate Williams' testimony on this point stands undisputed.

[3]   Inmate Williams testified that he saw DO Johnson place Henderson in the tub room and that he observed that she did not lock the door to the tub room, which Inmate Williams found "really quite unusual." (Doc. 82-7, at 21). This conflicts with the testimony of DO Johnson and Nurse Pinson, both of whom state that an escort officer—not DO Johnson—brought Henderson into the medical unit and initially placed her in the tub room. Neither party attempts to fully address this discrepancy and both appear to accept DO Johnson's and Nurse Pinson's version as to who initially placed Henderson in the tub room. Plaintiff appears to construe Inmate Williams' statement as attesting to the fact that DO Johnson placed Henderson in the tub room after she briefly left to use the restroom. In any event, it is undisputed that, at some point, DO Johnson unlocked the door to the tub room and never relocked it prior to her departure from the main area of the medical unit.

such that he could have observed her unlock the tub room door. DO Johnson testified that she and other officers are trained to lock down unsecured inmates who are going to be unsupervised, but they are not required to do so with respect to trustees. The evidence reflects that DO Johnson was not aware at the time of the incident that Inmate Johnson was a trustee. With respect to the operative chain of events, DO Johnson testified as follows:

Q      [] Did you lock down Jessie Johnson before you left the desk to go to the treatment room?

[A]      No.

Q      [] Did you do anything to restrain or secure Inmate Johnson before you went to the treatment room?

A      No.

*      *      *

Q      And just generally leaving aside the -- the trustee issue, are you trained to lock down unsecured inmates who are also going to be unsupervised?

[A]      Yes.

Q      [] Okay. So you left Jessie Johnson and you now know one other unsecured male inmate unsupervised in the main hall of the medical unit, correct?

[A]      Negative. There was a nurse at the -- at the desk.

*      *      *

Q      There were no other DO's in the medical unit at the time that you went to the treatment room, correct?

A      Correct.

Q      And at the time that you went to the -- the treatment room, Ms. Henderson was alone and restrained in the unlocked tub room, correct?

A      Correct.

Q      Is that consistent with Tulsa County Sherriff's Office policy?

[A]    No.

Q      [] Would you agree with me that the -- the scenario that I've just described created a substantial risk to Ms. Henderson's safety?

[A]    No.

Q      Why don't you agree…that she was at substantial risk?

A      Because there was a nurse at the desk.

Q      Okay.  So you think it…it fell on Nurse Pinson to provide the security supervision at the point you left?

[A]    No.

Q      [] Okay.  I guess I'm not understanding what you're saying then…how is it that you believe that Ms. Henderson was not placed at substantial risk?

[A]    I don't know how to answer that.

(Doc. 93-3, at 51-54).[4]

One of the primary focuses of the subsequent rape investigation was how the tub room came to be unlocked while Henderson was shackled inside.  According to DO Johnson, just prior to the medical emergency being called, she informed one of the nurses that Henderson was in the tub room.  The nurse responded by saying "[o]h yeah, that's right."  (Docs. 93-1, at 6; 93-3, at 46).  DO Johnson took this to mean that the nurse was ready to see Henderson, so DO Johnson unlocked the tub room door to remove Henderson.[5]  Thereafter, the medical emergency was called.  It is unclear from the record exactly how much time passed between the medical emergency occurring and the unlocking of the tub room door, but DO Johnson described the

---

[4]  Portions of the quoted testimony contain the denotation "[A]" at the beginning of the witness' response to indicate that an objection by opposing counsel has been omitted.

[5]  While DO Johnson stated that she was unlocking the door so that Henderson could see the nurse, DO Johnson also testified that nurses had keys to the tub room.  It is unclear from the record why DO Johnson would unlock the tub room door when the nurse could access Henderson in the tub room without assistance from a Detention Officer.

unlocking of the door as "just before" the emergency was called. (Doc. 93-1, at 6). It is also unclear whether Henderson was taken out of the tub room at that time or simply remained inside with the door unlocked.

Inmate Williams was sitting outside one of the suicide rooms at the time Henderson was placed in the tub room. Inmate Johnson was seated across from Inmate Williams. According to Inmate Williams and the TCSO investigation report, after the medical emergency was called and DO Johnson went into the treatment room, only Inmates Johnson and Williams remained in the main hall of the medical unit. Inmate Johnson told Inmate Williams that he intended to make sexual contact with Henderson, and shortly thereafter Inmate Williams observed Inmate Johnson enter the unlocked tub room and exit after approximately ten minutes. DO Johnson and DO Thomas both returned to the main hall of the medical unit at the time Inmate Johnson was exiting the tub room and each witnessed the tub room door closing. DO Johnson immediately confronted Inmate Johnson about whether he had been in the tub room and he denied having been. According to the TCSO investigative report authored by Corporal T.N. Helm and dated October 24, 2011 (the "investigative report"), DO Johnson then entered the tub room where the following exchange with Henderson occurred:

> [DO Johnson] asked Henderson if the male inmate had been in the room. Henderson put her head down, shook her head and didn't talk. Johnson then told Henderson she needed to talk and say what had happened. Johnson asked Henderson, "Did he touch you?" With this, Henderson shook her head yes. Johnson asked "Did he touch your breasts?" and Henderson shook her head no. Johnson asked "did he touch your crotch?" and Henderson said "Yes."

(Doc. 93-1, at 6). DO Johnson then exited the tub room and informed DO Thomas of what she had been told by Henderson. Sergeant James Pirtle was then told of the incident and an investigation was initiated.

Henderson was transported to a hospital for an examination. It was determined that

Henderson had bruising, swelling, and some mid-line tearing of her vagina that was consistent

with forced intercourse. Inmate Johnson was subsequently charged with rape.[6]

As noted, following this incident, TCSO conducted a full investigation into Henderson's

rape. TCSO's investigative report ultimately reached the following conclusions:

> After conducting interviews and reviewing reports, I found policy was violated. The Medical Unit is essentially a segregation unit, requiring two officers at all times. D.O. Thomas left his post to respond to a medical emergency when the inmate worker could have accomplished the same task. Additionally, D.O. Johnson and D.O. Thomas failed to maintain the log book in the Medical Unit, as required by policy. While this is a shared responsibility, Johnson knew Henderson was on the unit at some time around 17:30 hours and the log never reflected her arrival.

> Regarding the alleged sexual assault, two major causal factors were identified. First, the tub room was unsecured at the time of the incident. It appears this was due to D.O. Johnson failing to relock the door when the medical emergency was called. The second was D.O. Thomas failing to remain at his assigned post. Thomas left the unit to respond to a medical emergency, thereby diminishing the ability of the officers to properly supervise the unit. When D.O. Johnson entered the examination room, as required by policy, the main hall of the medical unit was left unsupervised and inmates were unsecured.

(Doc. 93-1, at 8).

It is undisputed that it is against TCSO policy for the medical unit to be single-staffed,

and single staffing of the unit raises security concerns. However, both Detention Officers

testified that it is common for one of the two medical unit officers to be called upon to

---

[6] Defendants point out that the rape charge against Inmate Johnson was later dismissed when Henderson briefly recanted and stated that the encounter had been consensual. However, *defendants'* expert, Dr. Jeff Schwartz, believes that, based upon the evidence in the case file, Henderson was forcibly raped. In addition, Henderson has since explained that she recanted because she was concerned for her mother's safety. Plaintiff also points out that her recantation occurred in the course of an interview by TCSO deputies, without her counsel present, *after* this litigation had been filed.

temporarily leave the unit for escort or other duties.  DO Thomas testified that he received no training as to whether, or when, it was proper to leave the medical unit to perform other duties.

DO Johnson and DO Thomas both underwent 160 hours of training at TCSO's Jail Academy prior to their placement in the Tulsa County Jail.  This training included information about the prevention of sexual assaults.  TCSO maintains a zero tolerance policy against inmate rape and sex-related offenses, which provides:

> The Tulsa County Sheriff's Office has a zero tolerance standard for the incidence of inmate rape and sex-related offenses and attempts thereof and will make every effort to prevent these incidents. The Sheriff's Office will strictly enforce all federal and state laws regarding inmate sexual misconduct, threats of sexual assault or intimidation by providing clear definitions of prohibited conduct, establishing uniform methods of the prompt reporting and investigation of allegations of sex-related offenses or threats, identification of predators, protection of victims and prescribing sanctions for substantiated sexual offenses as well as false allegations.

(Doc. 82-17, at 1).  Sheriff Glanz made this policy well known among jail staff.

The Tulsa County Jail voluntarily participated in the "National Inmate Survey 2008-09" conducted by the Bureau of Justice Statistics which compiled statistics regarding the prevalence of sexual victimization in prisons and jails throughout the United States.  The Tulsa County Jail was identified as a low incidence facility based upon the 2008 and 2009 information provided. Shortly thereafter, in April 2012, the Department of Justice ("DOJ") published a report based upon the National Inmate Survey.  In connection with this report, DOJ requested information from TCSO.  In providing that information, TCSO noted that the National Inmate Survey had requested only information for 2008 and 2009, but that TCSO was voluntarily providing information from 2010 "to ensure that complete, accurate, and updated information [wa]s presented."  (Doc. 93-15).  The TCSO information, which is dated March 29, 2011, reported zero instances of investigations regarding staff-on-inmate sexual abuse and three inmate-on-inmate

sexual abuse investigations for 2010. Henderson points out that this reporting omits, at a minimum, the investigations regarding alleged staff-on-inmate sexual misconduct alleged by LaDona Poore and Lindsey Shaver—both of which occurred in 2010. Defendants offer little explanation for this omission, other than to say that they were not required to provide statistics for 2010.[7]

Poore and Shaver were juvenile female inmates housed in the medical unit in 2010. An investigation revealed that Ms. Poore was likely sexually assaulted by Detention Officer Seth Bowers while in the Tulsa County Jail. Ms. Shaver was likewise allegedly subjected to sexually inappropriate behavior at the hands of Bowers, who resigned during the course of an investigation into his actions. Both Poore and Shaver have filed lawsuits against Sheriff Glanz, each of which are now pending before this Court.

Aside from the Shaver and Poore investigations, former TCSO employee Officer Cherry Anjorin, stated as follows with respect to the medical unit:

> [T]here were a lot of reported cases of the nurses having sex in the back medical rooms because there is nothing back there. I mean, you can go back there and sleep if you want to because there is no one to -- and they are open to staff and to trustees that are in medical or inmates that come down to medical because the medical you had called down 80, 90 -- 60, 70 inmates for physicals. That's excluding the people that are housed in medical. And so you have inmates just moving around in medical, and it was mostly only one person in there so you couldn't watch all the places. So there were inmates coming out of the rooms, the back rooms with nurses, and, of course, that's why I say a lot of nurses were fired.

(Doc. 93-27, at 33). Other investigations of sexual misconduct in the medical unit included an alleged sexual assault of Dolan Prejean by a nurse in the medical unit, inappropriate conduct by a

---

[7]     Defendants' reply brief states that Chief Robinette "inadvertently referenced three years (2008-2010) instead of the two years that were requested." (Doc. 100, at 5). The relevant deposition testimony cited on this topic does *not* support this statement and, as noted above, the document containing the statistics directly states that the 2010 data was being provided voluntarily to ensure completeness and accuracy. (*See* Doc. 93-15).

therapist with female inmates, and a nurse having a sexual relationship with Inmate Chester Washington. Former nurse, Robin Mason, who worked at the Tulsa County Jail from March 2009 to October 2013 stated that there was "a persistent lack of security within the medical unit" because the inmates and staff were aware of the lack of video surveillance. (Doc. 93-30). Anjorin, however, pointed out that when an inappropriate relationship between staff and an inmate was discovered, the staff member was immediately fired, and detention officers were reminded of that fact at the next staff meeting. All of the instances of sexual misconduct referenced by Anjorin and Mason (including the Poore and Shaver matters) involve staff-on-inmate sexual misconduct. Henderson does not identify any instances of inmate-on-inmate sexual assault in the medical unit which occurred prior to her encounter with Inmate Johnson.

On February 16, 2012, Henderson filed her complaint (Doc. 2). On November 27, 2012, this Court entered an Opinion and Order (Doc. 38) denying the defendants' motions to dismiss. The defendants now seek summary judgment as to Henderson's individual and official capacity § 1983 claims.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In considering a summary judgment motion, the courts determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence of the non-movant is to be taken as true, and all justifiable inferences are to be drawn in non-movant's favor. *Id*. at 255; *see Ribeau v. Katt*, 681 F.3d 1190,

1194 (10th Cir. 2012). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Anderson*, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

"When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). When the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998). The Supreme Court has recently emphasized the importance of drawing inferences in favor of the nonmovant in cases raising qualified immunity and cautioned that "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## DISCUSSION

### I. Qualified Immunity as to DO Johnson and DO Thomas

Defendants argue that DO Johnson and DO Thomas are entitled to summary judgment because Henderson has failed to demonstrate that their conduct amounted to an Eighth Amendment violation. More precisely, defendants argue that Henderson has not met her burden

of demonstrating that DO Johnson and DO Thomas were deliberately indifferent to a substantial risk of harm to Henderson. For reasons stated below, the Court finds that a triable issue of material fact exists with respect to whether such a constitutional violation indeed occurred.

To prevail on her § 1983 claim, Henderson must ultimately prove two essential elements: that a right secured by the Constitution or laws of the United States was violated and that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011). As to the first element, Henderson asserts a claim under the Eighth Amendment, which "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).[8] A violation of the duty imposed by the Eighth Amendment gives rise to a civil rights claim under § 1983. *See id.* In *Farmer v. Brennan*, the Supreme Court explained the prison official's duty to protect as it relates to sexual assault:

> [P]rison officials have a duty. . .to protect prisoners from violence at the hands of other prisoners.... Having incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

511 U.S. 825, 833–34 (1994) (internal quotation marks and citations omitted).

Even so, it is not "every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.*

---

[8] Because Henderson was convicted one day prior to the date of the alleged assault, her claims are analyzed under the Eighth Amendment. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990).

at 834. Two conditions must be present to impose liability. First, the alleged injury must be sufficiently serious. Sexual assault of the type suffered by Henderson satisfies this objective component. *Tafoya*, 516 F.3d at 916. "Second, because the Eighth Amendment prohibits only cruel and unusual punishment, the prison official must have a sufficiently culpable state of mind to violate the constitutional standard." *Id*. The requisite culpability level is deliberate indifference. *Id*.

"Deliberate indifference" is more than negligence or even gross negligence; it requires knowing and disregarding an excessive risk to inmate health or safety. *Id.*; *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Stated differently, it is a subjective standard, "requiring that the official actually be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Tafoya*, 516 F.3d at 916 (quoting *Farmer*, 511 U.S. at 837). "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Id*. However, that official's knowledge of the risk "need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Id*. (italics in original); *see also Farmer*, 511 U.S. at 843 (prison official liable even though he "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."). "It does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk… for reasons personal to him or because all prisoners in his situation face such a risk." *Tafoya*, 516 F.3d at 916 (quoting *Farmer*, 511 U.S. at 843).

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001); *Tafoya*, 516 F.3d at 916 ("a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition."). The Tenth Circuit has noted that "in some cases" the trier of fact may conclude that an official knew of a substantial risk "from the very fact that the risk was obvious." *DeSpain*, 264 F.3d at 975 (quoting *Farmer*, 511 U.S. at 842).

Defendants argue that deliberate indifference cannot be shown with respect to DO Johnson and DO Thomas because they both believed the tub room door was locked when they responded to the medical emergency. Henderson disagrees, contending that the undisputed evidence demonstrates that DO Johnson and DO Thomas were aware of several factors that created a substantial risk that she would be raped.

As an initial matter, the defendants urge an overly narrow view of the risk at issue. The defendants argue that, in the absence of specific knowledge on the part of the Detention Officers that the tub room door was unlocked, there can be no showing of deliberate indifference. While the tub room door being unlocked is certainly one of the "but for" causes of the sexual assault, Tenth Circuit precedent counsels in favor of a broader view of what can constitute knowledge of a substantial risk. For example, in *Tafoya*, the court emphasized that an official need not have knowledge of the risk to a specific inmate, or knowledge of the exact manner in which injury might occur in order for the official to be deliberately indifferent. 516 F.3d at 916. Moreover, the risk can come from "multiple sources." *Id*. The *Tafoya* court examined *multiple* failings of Sheriff Salazar, finding that the numerous deficiencies would permit a jury to infer that he was

aware of the likelihood that an assault would take place and failed to act. *Id*. at 921-22; *see also Farmer*, 511 U.S. at 843 (finding liability even though the prison official "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault").

It is undisputed that the medical unit, which is frequented by both male and female inmates, presents a unique challenge to Detention Officers because of the necessity of keeping those male and female inmates separated at all times. In order to keep females separated from males in the medical unit, they are often put in the tub room, as was Henderson. Accordingly, the tub room door must be locked to ensure that separation—a fact both Detention Officers are keenly aware of. Both DO Johnson and DO Thomas were aware that Henderson was in the tub room at the time in question and that she was restrained. DO Johnson was specifically aware that Inmate Johnson was seated near the tub room and unrestrained. She also knew that Inmate Johnson was in a position such that he could have observed her unlock the tub room door. DO Johnson acknowledges unlocking the tub room door, but states that she thought it was locked when she left the main area of the medical unit. She did not, however, do anything to lock down or otherwise restrain Inmate Johnson despite the fact that TCSO policy mandated that unsecured inmates be secured in such situations and the fact that she was fully aware that Inmate Johnson would be without the supervision of a Detention Officer. Nor did DO Thomas attempt to restrain Inmate Johnson prior to DO Thomas' departure from the medical unit, despite the fact that his departure inhibited the ability of DO Johnson to properly supervise the medical unit, which requires the presence of two Detention Officers. Neither Detention Officer checked on Henderson prior to their discrete departures, or made any effort to ensure that the tub room door was locked. When faced with these facts, DO Johnson could not explain why she believed no

substantial risk was posed to Henderson, other than to say that a nurse remained at the medical desk—a fact directly controverted by other parts of the record.[9]  Construing these facts in the light most favorable to Henderson, a reasonable trier of fact could infer that that DO Johnson and DO Thomas had knowledge of a substantial risk of harm to Henderson based upon the obviousness of the risk and that they failed to take steps to alleviate that risk.  As such, the Court finds that genuine issues of material fact exist as to whether DO Johnson and DO Thomas were deliberately indifferent.  They are therefore not entitled to qualified immunity on the basis that no constitutional violation occurred as a matter of law.[10]

## II.      Section 1983 Claim against Defendant Glanz in His Individual Capacity

Section 1983 "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her

---

[9]     The TCSO Incident Report (Doc. 93-5) states that Nurse Pinson recalled during the investigation that she went to a treatment room to assist Nurse Chumley with the inmate that was brought into the medical unit in connection with the medical emergency.  Inmate Williams corroborated this, as he testified that once DO Johnson went to the treatment room, only he and Inmate Johnson remained in the main area of the medical unit.  (*See* Doc. 93-4, at 10).

[10]     Sheriff Glanz seeks summary judgment as to the individual and official capacity claims against him on the basis that DO Johnson and DO Thomas did not violate Henderson's constitutional rights.  Having found that a genuine dispute of fact exists with respect to that issue, Sheriff Glanz is not entitled to summary judgment on that basis.  The defendants do not challenge the "clearly established" prong of the qualified immunity standard, other than in a single sentence stating that "Plaintiff failed to show that the Sheriff violated a clearly established right."  (Doc. 82, at 21).  Nevertheless, the Court finds that it is clearly established that inmates have a right to be free from assaults resulting from a jail official's failure to ensure sufficient staffing and/or supervision of inmates.  *See, e.g., Tafoya*, 516 F.3d at 919-20 (finding jury question as to deliberate indifference based upon failure to install more surveillance cameras); *Lopez v. LeMaster*, 172 F.3d 756, 763-64 (10th Cir. 1999) ("material issues of fact remain concerning whether the county had a policy of providing insufficient monitoring and supervision of inmates and insufficient staffing, held with deliberate indifference, resulting in unconstitutionally inadequate conditions of confinement, which policy was the moving force, as a matter of law, behind the attack on appellant").

subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution. . . ." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting 42 U.S.C. § 1983). A plaintiff may therefore establish § 1983 liability of a defendant-supervisor by demonstrating that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* As with the Detention Officers, the requisite degree of culpability applicable to Sheriff Glanz is deliberate indifference. *Tafoya*, 516 F.3d at 916.

Sheriff Glanz argues that the record evidence demonstrates that he was not deliberately indifferent with respect to any conditions which could have created a risk of harm to Henderson. Sheriff Glanz further contends that TCSO's policies, for which he is responsible, are designed to prevent sexual assault and thus demonstrate his lack of indifference towards this type of harm. Sheriff Glanz also points out that TCSO has been recognized as a facility with a low incidence of sexual assault. Henderson responds with three alleged *de facto* policies or customs that were the moving force behind the alleged violation of her constitutional rights.

First, Henderson alleges that there existed in the medical unit a pattern of sexual misconduct by staff and security lapses which amounted to a "culture of indifference." (Doc. 93, at 29). In support of this alleged policy/custom, Henderson makes reference to a number of instances of misconduct by medical and jail staff, including the Poore and Shaver matters. The instances of alleged sexual misconduct identified by Henderson as occurring in the medical unit prior to her rape were materially different from the type of conduct at issue in this case. Many of them were consensual or involved a Detention Officer exploiting his position of trust. As the Court has noted, the alleged harm suffered by Henderson was caused and/or contributed to by the

specific actions of DO Johnson and DO Thomas in leaving an unsecured male inmate outside of the unlocked tub room door with no supervision after both of the Detention Officers had departed the main area of the medical unit for a significant period of time. Hence, even if Sheriff Glanz were aware of, and indifferent to, this ill-defined and generalized pattern of alleged sexual misconduct by staff in the medical unit—a question the Court does not decide—any policy or custom of disregarding such conduct did not "cause[] the complained of constitutional harm" based upon the facts at issue in this case. *Dodds*, 614 F.3d at 1199. DO Johnson's and DO Thomas' actions cannot be said to have stemmed from a culture of indifference with respect to sexual misconduct by staff in the medical unit generally. As such, Henderson's first contention as to Sheriff Glanz is without merit.

Second, Henderson points to a failure on the part of Sheriff Glanz to enforce policies necessary to the safety of inmates as one of the causes of the alleged assault. Specifically, Henderson alleges that, despite a policy that the medical unit be double-staffed at all times, "it was common for detention staff to be called out of the medical unit, leaving one officer to supervise the entire unit." (Doc. 93, at 31). Henderson further argues that there was no plan in place to provide backup supervision when instances of single staffing arose.

TCSO has an official policy of having two Detention Officers guard the medical unit because of the difficult corrections challenges the medical unit presents. Chief Robinette testified that it would "perhaps" be considered "unsafe" to have a single officer guarding the medical unit. (Doc. 93-7, at 111). Notwithstanding, both DO Johnson and DO Thomas testified that it was common for one of the two officers staffing the medical unit (assuming there were two to begin with) to be called out of the unit to perform tasks such as escorting an inmate. DO

Thomas testified as follows with respect to the protocol for leaving his post while staffing the medical unit:

> Q      [] What was your training with respect to – under what circumstances were you permitted to leave your post in medical?
>
> [A]      There were – **there was no training on that**.
>
> Q      [] Was there any protocol on when you're permitted to leave your post in medical?
>
> [A]      Other than – you know, that's what was what had commonly done [sic]. **Other than that, no**.
>
> Q      So no one ever said – no one at the jail ever told you that you should stay in medical as opposed to leaving your post?
>
> A      **No**.

(Doc. 93-6, at 30, objections omitted and emphasis added).  In addition, there were times when the medical unit would be single staffed for the entire day.  For example, in February 2010, the medical unit had only a single officer guarding it for 22 days out of the month.  While TCSO and Sheriff Glanz had an official policy of keeping the medical unit double staffed, the record here is sufficient to create a dispute of fact as to whether there was indeed a *de facto* policy/custom of understaffing the medical unit at times.  As the Court has already concluded, a triable issue of fact exists as to whether Henderson's alleged harm was caused, at least in part, by DO Thomas' departure from the medical unit and the corresponding lack of supervision it created.

In addition, factoring into the above analysis is Henderson's contention that Sheriff Glanz did nothing to evaluate the need for surveillance cameras in the medical unit despite having notice of other sexual misconduct.  As Henderson points out, there was no video surveillance equipment within the medical unit, other than cameras within the suicide cells.  According to plaintiff's jail standards expert, Jeff Eiser, surveillance cameras are part and parcel of ensuring

inmate safety vis-à-vis adequate staffing. As Eiser points out in reference to DO Thomas' departure from the medical unit:

> [T]hat's the officer's responsibility to make sure he knows what he has before he would exit. If he has no backup -- for example, we talked about in the report about cameras, et cetera. They are a good supplement if by chance you have an emergency, and you can call up to central [command] and say can you keep an eye on my hallway. I have to go down and take this gurney down. But there was no backup for that. So, therefore, he left without any backup.

(Doc. 93-8, at 121). In other words, surveillance cameras can be utilized to provide backup when a detention officer cannot be physically present by providing real-time monitoring. Surveillance cameras therefore could have impacted Inmate Johnson's ability to assault Henderson, as real-time video monitoring would have detected his entry into the tub room and an officer could have been immediately directed to the area. The Tenth Circuit recognized the importance of such surveillance equipment and its ability to serve as a deterrent to misconduct and provide supervision support in *Tafoya*. *See* 516 F.3d at 920 ("Whether or not [Sheriff Salazar] failed to install more cameras out of deliberate indifference or lack of funding is a genuine issue of material fact to be considered by a jury.").

Based upon the foregoing, Sheriff Glanz would not be entitled to summary judgment in his individual capacity unless the undisputed facts reveal that he was not deliberately indifferent with respect to the alleged policy/custom of inadequate staffing and supervision, as a matter of law.

As noted in section I, *supra*, for Sheriff Glanz to be considered deliberately indifferent, Henderson has the burden of demonstrating that he was aware of a substantial risk of harm and that he failed to take steps to alleviate that harm. *Tafoya*, 516 F.3d at 916. Henderson again points to the Poore and Shaver incidents as illustrative of Sheriff Glanz's knowledge of the policy/custom of understaffing and under-supervising the medical unit; knowledge that this

staffing issue was creating a dangerous situation for inmates; and his failure to alleviate that danger. With respect to this alleged policy/custom, the Poore and Shaver matters become far more relevant, as they involved a situation where a single jail employee (Detention Officer Seth Bowers) was watching the medical unit and was able to open the cells of female juvenile inmates and, allegedly, engage in inappropriate sexual behavior.[11] This type of assault would likely not have happened had a second Detention Officer been guarding the medical unit or had the unit been subject to video monitoring. Here, the alleged assault of Henderson was likewise caused, at least in part, by DO Thomas leaving his post, and thus a lack of adequate supervision.

Further, it is clear that the Poore and Shaver incidents—of which Sheriff Glanz had personal knowledge—were attributable, at least in part, to the medical unit having been staffed by a single Detention Officer and having been unmonitored by surveillance equipment. However, when questioned about the Poore incident, Sheriff Glanz revealed that he did very little to inquire how the assaults happened or how such incidents could be prevented in the future. For example, Sheriff Glanz testified as follows:

> Q.      [] Did you ever ask how is this officer ever getting into these juvenile female cells **without somebody else being present?**
>
> A.      **No.  I never asked that question.**
>
> Q.      Did you ever ask how can we prevent such things from happening again?
>
> A.      Yes.
>
>                                     *      *      *
>
> Q.      [] When you asked how can we prevent this type of thing from happening in the future, what were you told?

---

[11]     The Poore allegations were found to have been credible and TCSO recommended that Detention Officer Bowers be criminally prosecuted. The report of Billy McKelvey, who investigated the Poore incident, believed that Shaver was also victimized by Bowers.

> A. Just to make people more aware of what's going on in that unit and to always be on guard.

(Doc. 93-16, at 80-81, emphasis added). Hence, the gist of the sole corrective measure that Sheriff Glanz employed following the Poore incident was to recommend that staff be more attentive:

> Q. [] My question is, after these events, after you find out that there -- that your investigation has determined that it was credible that a sexual assault of a juvenile female took place in your jail, other than recommending that staff be more attentive, were there any other recommendations for changes to be made to avoid this happening in the future?
>
> A. **I can't specifically say that any that I'm aware of were made.**

(Doc. 93-16, at 89-90, emphasis added). The record does not reveal any efforts that were made prior to Henderson's assault to ensure that there would be two Detention Officers guarding the medical unit at all times; create a plan for substitute staffing or video surveillance; or to train Detention Officers with respect to leaving their posts in the medical unit. Guards are supposed to guard. A reasonable juror could conclude that instructing guards to "always be on guard" and to be attentive is akin to taking no action at all. Based upon the record, construed in the light most favorable to Henderson, a reasonable juror could conclude Sheriff Glanz was deliberately indifferent with respect to a *de facto* policy/custom that caused Henderson's alleged harm.[12]

---

[12] Defendants rely upon *Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998) as dispositive of Henderson's argument with respect to an alleged policy/custom of understaffing at the Tulsa County Jail. In *Barney*, the court rejected the plaintiff's argument that the County should be held liable for adopting a *de facto* policy of "permitting a single jail officer to be on duty alone." *Id*. at 1309 n.8. As the court noted, this was because:

> The record reveals no previous incidents of sexual harassment or assault of female inmates at Box Elder County Jail which would provide actual or constructive notice to the County that its one-jailer policy and failure to adopt certain policies would result in the specific injuries alleged here.

Based upon the foregoing, a triable issue of fact exists as to (1) whether Sheriff Glanz possessed responsibility for the continued operation of a *de facto* policy of permitting the medical unit, at times, to be understaffed and under-supervised; (2) whether Sheriff Glanz had knowledge of a substantial risk to the safety of inmates stemming from that *de facto* policy in light of prior incidents which were, at least in part, caused by a dearth of staffing/supervision; and (3) whether he failed to take steps to alleviate that substantial risk. As such, Sheriff Glanz is not entitled to summary judgment on the basis of qualified immunity in his individual capacity.

### III.    Section 1983 Claim against Defendant Glanz in His Official Capacity

Henderson's claim against Sheriff Glanz in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents, and is considered under the standards applicable to 42 U.S.C. § 1983 claims against municipalities or counties. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). To hold a county / municipality liable under § 1983, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "that there is a direct causal link between the policy or custom and the injury alleged"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted). A municipality's conduct constitutes the "moving force" behind the injury alleged when that conduct is deliberate and a causal link exists between the municipal action and the deprivation of federal rights. *See Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404

---

*Id.* Here, as noted, the record *does* reveal prior incidents of inappropriate sexual behavior which would provide actual notice that single-staffing the medical unit could result in the type of harm asserted by Henderson. *Barney* is therefore distinguishable, yet highly informative.

(1997).  The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson*, 627 F.3d at 788 (internal quotations and citations omitted).

The same evidence which creates a dispute of fact as to liability on the individual capacity claim against Sheriff Glanz precludes summary judgment as to the official capacity claim.  The Court has found that a reasonable trier of fact could conclude that there was a *de facto* policy or custom on the part of TCSO of permitting the medical unit to be understaffed and that this policy/custom caused Henderson's constitutional violation.  A reasonable juror could also conclude that the *de facto* policy/custom was the moving force behind the constitutional violation, i.e., causation.  Accordingly, Sheriff Glanz is not entitled to summary judgment with respect to Henderson's official capacity claim.

## IV.    Failure to Exhaust

Defendants assert that Henderson's Eighth Amendment claim should be barred under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA").  The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  *Id*.  The PLRA applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong", *Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless of the type of relief available under the institutional administrative procedure. *Woodford v. Ngo*, 548 U.S. 81 (2006). There is no futility exception to § 1997e(a)'s exhaustion requirement. *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). However, this Court is "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials." *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) (quoting *Aguilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)).

Henderson contends that any purported failure to exhaust on her part resulted purely from TCSO's efforts to thwart her attempts to utilize the grievance process. The Court agrees. On January 14, 2012, Henderson filed a grievance related to the sexual assault allegations at issue in this case. Henderson states that this was not her first time to do so and that multiple prior rape-related grievances had been ignored by TCSO. As such, her counsel withdrew the January 14 grievance on January 18, 2012, pursuant to the TCSO Inmate Handbook, which states that an inmate "may withdraw a grievance at any time." (Doc. 82-28). On January 27, 2012, Henderson's counsel sought to reassert and renew the January 14 grievance to ensure full exhaustion under the PLRA. TCSO refused to treat the grievance as reasserted. Henderson filed another grievance on February 1, 2012, which was identical to the January 14 grievance. On February 3, 2012, TCSO denied the February 1 grievance on the basis that only one grievance may be filed by one inmate for a single incident under the Inmate Handbook. TCSO also noted that the January 14 grievance had been closed as a result of its withdrawal. Henderson then appealed the denial of her February 1 grievance. Her appeal was denied without comment.

The Court finds that, in light of the extensive efforts made by Henderson and her counsel to comply with TCSO's grievance procedures, her claim is not barred under the PLRA as

unexhausted.  Even assuming her efforts were insufficient for exhaustion, the actions of TCSO contributed to any failure on her part to comply with TCSO's exhaustion requirements.  TCSO's policies are silent on the issue of whether a grievance may be reasserted after it has been withdrawn.  TCSO nevertheless refused to permit Henderson to renew her January 14 grievance on the basis that such action was not permitted.  TCSO then refused to accept her February 1 grievance.  Thus, TCSO essentially sought to thwart Henderson's good faith efforts to comply with the grievance procedure based purely upon technical grounds.  Moreover, TCSO was not prevented from performing a full investigation into Henderson's allegations because of the grievance's withdrawal as a full investigation had already been performed by TCSO immediately following the incident.  The defendants are not entitled to summary judgment based upon a failure to exhaust under the PLRA.  *See Little*, 607 F.3d at 1250 (citing *Lyon v. Vande Krol*, 305 F.3d 806, 808 (8th Cir. 2002) (en banc)) ("Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust.").

**IT IS THEREFORE ORDERED** that the defendants' Motion for Summary Judgment (Doc. 82) is **denied**.

**SO ORDERED** this 23rd day of June, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE